McKELL v. CHESAPEAKE & O. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. January 4, 1910.)

No. 1,977.

**1.** SALES (§§ 32, 66*)—CONTRACT TO PURCHASE PRODUCTION OF COAL MINES.

The owner of a tract of coal land some little distance from a railroad, in a letter to the president of the railroad company, stated that he was considering the development of his lands, had received several proposals for leases, etc., and suggested a number of propositions for the building of an eight-mile branch line from the company's road, among them that the company build the branch, "receiving from operators to be secured by me, a guarantee of a tonnage of freight that will be satisfactory to you." In answer the president signified the willingness of the company to build the line "for any parties who will furnish the right of way, and who will agree to put in a coal plant of not less than a thousand tons of coal a day, * * * and who will furnish the coal at the same price as the Pocahontas people do. * * * We will agree then to take from them at this price whatever amount of coal they agree to furnish, not, less than 100,000 tons a year, or, if they prefer to ship it themselves, we will give them the rate made to any parties." This offer was accepted by the landowner in a letter in which he said: "I will commence immediately to make leases, and push my part of this contract with all promptness." Leases were accordingly made, the mines developed, right of way was furnished, and the branch built, and the lessees, electing to sell their coal to the company, did so for a number of years, after which it refused to receive more. Held, that the correspondence created a contract for purchasing the coal when accepted, and was not merely a proposal on the part of the company to negotiate future contracts, and that such contract, construed in the light of the situation of the parties and the language of the letters, was not one to take such coal only as the landowner should personally mine, but included such as should be mined by his lessees, as was evidently contemplated by the parties.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 59; Dec. Dig. §§ 32. 66.*]

**2.** CONTRACTS (§ 24*)—VALIDITY—ACCEPTANCE VARYING FROM OFFER—ASSENT IMPLIED FROM PERFORMANCE.

The fact that, in accepting a proposed contract by letter, a party stipulated for a further minor condition, did not invalidate the contract, although such letter was not replied to, where the parties entered upon performance as though such condition had been accepted, and continued such performance for several years.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 100-103; Dec. Dig. § 24.*]

**3.** SALES (§ 84*)—CONTINUING CONTRACT—DURATION OF CONTRACT BY RAILROAD COMPANY FOR PURCHASE OF COAL.

A contract between the owner of a tract of coal land and a railroad company, by which the landowner agreed to develop mines on his land to a stated capacity, and the company agreed to build a branch line to the mines and to purchase the coal produced at the ruling price of a certain other coal, which contained no provision as to its duration, was not terminable at the will of one party, but was permanent so long as the stipulated production was maintained, unless sooner terminated by consent of both parties.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 234, 235; Dec. Dig. § 84.*]

**4.** CORPORATIONS (§ 426*)—CONTRACTS MADE BY OFFICER—RATIFICATION.

A contract, made for a railroad company by its president, cannot be impeached by the company on the ground of his want of power, where he

was also its business manager, and the company, with full knowledge of the contract, performed its part of it for several years without dissent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1702–1704, 1713–1714; Dec. Dig. § 426.*]

5. RAILROADS (§ 18*)—PURCHASES—CONTRACTS ULTRA VIRES.

A permanent contract by a railroad company to purchase the coal produced by certain mines cannot be held ultra vires, where it does not appear that the quantity would be beyond what would be required for its own consumption in operating its road.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 18.*]

In Error to the Circuit Court of the United States for the Southern District of Ohio.

Action by Jean D. McKell, as administratrix of the estate of Thomas · G. McKell, deceased, against the Chesapeake & Ohio Railway Company. Judgment for defendant, and plaintiff brings error. Reversed.

Thomas G. McKell, since deceased, and of whose estate the plaintiff in error has, during the progress of this suit, been appointed adminstratrix, commenced this action in the court of common pleas for Scioto county, in the state of Ohio, to recover damages for the alleged breach by the defendant, the Chesapeake & Ohio Railway Company, of a contract made by the parties on or about April 26, 1892, the particulars of which are to be hereinafter stated. The defendant removed the action into the United States Circuit Court for the Southern District of Ohio upon the ground of the diverse citizenship of the parties.

The contract which the plaintiff relies upon was made by letters of correspondence between the intestate and M. E. Ingalls, then president of the railway company, and related to the building of a branch railroad by the defendant, about eight miles long, leading from its main line to a tract of coal lands in West Virginia owned by McKell, and the mining and delivery of coal by him for transportation by the railroad, or for sale to the company.

Upon the trial these letters were produced by the plaintiff and given in evidence; and other testimony explanatory of the circumstances in which the contract was made, and giving an account of the dealings of the parties thereunder, such as the deeding of the right of way by McKell, the furnishing of surveys made by him, the building of the railway, the location of and operation of mining plants and coke ovens, the leasing of lands by McKell for the production of coal, the election of McKell to sell the coal to the railway company, and the acceptance of the coal and shipments by the company, until on or about the end of 1894, when the company refused to take any more than a certain limited quantity, which was much less than the production of the mines, was being introduced by the plaintiff, when the presiding judge, being of opinion that enough had been shown in relation to the contract to enable the court to determine whether a contract between the parties was in fact made, and, if so, what was its nature, arrested the further introduction of testimony. The learned judge thereupon proceeded to give his construction of the letters, and upon that construction held that the plaintiff could not recover. After allowing the plaintiff to make certain offers of proof, which was admitted, tending to show the performance of the contract on the part of the plaintiff, the breach of it by the defendant, and the damages sustained in consequence, the court instructed the jury to return a verdict for the defendant, which the jury did.

The letters which constitute the contract are here set out in their order. The first is somewhat lengthy, but it seems necessary to a proper understanding of the main object and purpose which the parties had in view when they entered into the stipulations contained in the correspondence which followed:

"Chillicothe, O., March 28, '92.

"M. E. Ingalls, Esq., Cincinnati, O.—My Dear Sir: During the past year I was compelled to buy in the Bundy property in Jackson and Gallia counties,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

this state. In the development of this property I will need all the money originally intended to be expended on my West Virginia coal plant. This Bundy property has been in court for several years and purchase anticipated. I also wished to purchase some tracts of land joining me in West Virginia. The most important tract I have but lately secured. These facts, and the time and attention needed by my other interests for several years, induced me to take little active part in measures to promote the development of my New River land. Another fact that influenced me much was that I recognized the lack of knowledge and judgment on my part to properly handle business of the kind required. The more efforts I made in that direction, the lower became my estimate of my ability, nor has anything occurred since my last attempt to make me feel less humble in this regard.

"During this time numerous propositions have been made me—none, however, satisfactory or desirable enough to induce me to accept, or change my plan of letting the property lie dormant and be satisfied with the natural increase in its value—this having been my original intention. The prospect of making it a productive investment has been, however, very attractive to me from the time the first proposition was made me looking to that end. It was never more so than at the present time. The property is now in better shape for development, both as to R. R. interests and my own. Proposals recently made me for leases, some including the construction of the R. R., and my earnest desire to see coal on Dun Loup creek developed, has induced me to write you at this time.

"I am not sure but that you have already made such arrangements in other localities by way of branches that any development on Dun Loup creek is not now necessary or desirable on the part of your company. However this may be, I shall be glad to have your reply to the letter to guide my further actions. I will be under obligation to you if you will kindly give me the benefit of your views of the following propositions which suggest themselves to me, or possibly you may suggest some other plan that will be of mutual interest to me and C. & O. R. R.; that is, if any development on Dun Loup creek is of interest to you at this time.

"The propositions I suggest are all based on the building of not less than eight (8) miles of railroad up Dun Loup creek, commencing at New River bridge; also, that operators on this branch shall have same in and out rates of freight on coal, coke, lumber, etc., as given to operators on main line New River section.

"(1) The C. & O. R. R. Co. to build and operate said branch. Receiving from me deed for right of way through land owned by me. Also, my procuring or paying cost, if condemned, for right of way not owned by me. Receiving also from operators to be secured by me a guarantee of a tonnage of freight that will be satisfactory to you.

"(2) A corporation organized by me to build the road, subject to approval of chief engineer of C. & O. R. R. The road to be operated by C. & O. R. R. Co., a guarantee of tonnage by operators. The company building the railroad to receive compensation for use of road based on tonnage coming from or to this road.

"(3) The railroad to be built (subject to approval, as above) and operated by a company organized by me—using their own engines, cars, etc., as far as necessary, delivering and receiving freight at the New River bridge. The company owning and operating this branch to receive a proportionate or fixed rate per ton for coal, etc., delivered to C. & O. R. R.

"On the first plan I can act myself, having no associate in ownership of land; on second or third I would have to consult proposed associates who would provide money to build the railroad, etc. Either No. 2 or No. 3 can, I believe, be consummated from the character of the parties who have expressed a willingness to me to invest money in such an enterprise.

"My reason for not favoring leases on or near New River, now, when I have as good coal and much more favorable location for mining coal and making coke than Thurmond or Rush Run plants, is that any mines located there would have to pay New River rates to miners for digging coal, and as new mines were opened one after another going up the creek, this rate would

be demanded even though conditions became more and more favorable as advance was made into thicker coal.

"My opinion has been and still is that the best plan is to go at once into the thick coal, where all conditions are most favorable—no inclines needed—better places for building coke ovens and houses. If this is done, I believe coal and coke can be loaded on cars at as low a cost as any place when same character of coal is mined. This opinion is based on statements made me after thorough examination by competent and well-informed men on such matters.

"My idea has been to open up a new section under a new name, as instance Hawksnest Mines. Some miners working at that place informed me they would prefer mining coal at Dun Loup creek at same price paid them there, on account of more desirable location for their families. It has been my opinion that cheaper coal and coke must be produced than possible on New River under costly method necessary on river front, or this coal and coke cannot maintain itself against close competition in dull times from more favorably located mines of other sections.

"If my revenue comes from royalties on the coal, more revenue will come to me if mines on my land can keep in the market at all times. If I want to sell any of my land, it will for the same reason bring a higher price. If the development of Dun Loup creek (I do not own one-half of the property tributary to this creek) does not interest you now, it may at a future day, and I have no doubt you will at that time find me still the owner of the land I have now—willing and ready to enter into any arrangement for mutual interest.

"I have little idea that I will part with the property, as I have a high appreciation of its value, and while the C. & O. R. R. is under your intelligent and energetic management I do not expect any decline in its value, but an increase equal at least to the interest on the money I could now get for it. A sale of a part interest to good parties for the purpose of development would be the most satisfactory arrangement for me.

"I have taken the liberty of writing you at almost unpardonable length and at a time when the subject may have little interest to you, using this means to explain matters that circumstances prevented me doing in my interviews with you; also to explain my situation and views at this time. I must ask your kind indulgence for this.

"Very respectfully,	Thomas G. McKell,
	"O. I."

"Chesapeake and Ohio Railway Company.

"Office of the President.

"M. E. Ingalls, President, Cincinnati, Ohio.

"On Road, March 31, 1892.

"Mr. Thomas G. McKell, Chillicothe, Ohio—Dear Sir: I am in receipt of your communication of the 28th. Of course, if you build a railroad up Loup creek and connect with us, we shall be glad to do business with you, as we are with every branch that connects with us. If, however, you desire us to build it, in connection with the development that you may make in the coal business, I think we have about come to the following conclusion: That we will build a branch of reasonable cost for any parties who will furnish the right of way and who will agree to put in a coal plant of not less than a thousand tons of coal per day and coke ovens that shall use one-third of the same, and who will furnish the coal at the same price as the Pocahontas people do. We will agree then to take from them at this price whatever amount of coal they agree to furnish, not less than 100,000 tons a year; or, if they prefer to ship it themselves, we will give them the lowest rate made to any parties. We think that any new developments made should be upon the basis of Pocahontas re-  m. as it is only by getting the coal at the same price it is furnished there that we can hope to compete.

"I trust that you may be able to work on one or the other of these pla  : and develop your property.

"Very truly yours,	M. E. Ingalls, President."

"Albemarle Hotel, Madison Square,

"New York, April 25, 1892.

"M. E. Ingalls, Esq., Prest. C. & O. R. R.—Dear Sir: In regard to the matter of building a railroad up Loup creek I would say that I do not want to build the railroad myself, and will therefore accept your proposition contained in your letter of March 31, 1892, in which you propose to build railroad under certain conditions named therein. The guarantee of output of not less than 1,000 tons of coal per day I would understand is for a reasonable number of working days per year, when not prevented by strikes or accidents, and that any question arising shall be referred to arbitration for settlement.

"Very respectfully,                                    Thomas G. McKell.
                                                       "O. I."

"Chesapeake and Ohio Railway Company.

"Office of the President.

"M. E. Ingalls, President, Cincinnati, Ohio.

"New York, April 26, 1892.

"Mr. Thos. G. McKell, New York City—Dear Sir: I have yours of the 25th, enclosing mine of the 31st of March, and the two together seem to correspond and clearly express our meaning. There are one or two verbal understandings which we had, which I beg leave to add, as follows:

"First. It is understood that you turn over to us the surveys which you have had made and that you will give us the right of way for any extensions of this line that we may want to build, or any branches, where they go over your land.

"Second. That the present agreement will require about eight miles of railway to be constructed, and the cost of the same you feel certain will be less than $200,000.

"Third. Work on this railway shall be commenced not later than July 1st and pressed as rapidly as weather and circumstances will permit.

"Fourth. That you will commence on the coal development at the same time, and push it as fast as is consistent with economy and the weather, until it reaches the amount per day, to wit, 1,000 tons.

"If these are as we agreed and as you understand them, kindly answer, and the letters will form all the contract we shall need.

"Yours truly,                                          M. E. Ingalls, President."

"New York, April 26, 1892.

"Hotel Burnswick Co.

"M. E. Ingalls, President, New York City—Dear Sir: I have yours of this day. In reply will say: I will turn over to you maps and surveys which I have of work proposed on Dun Loup creek. I will also give you right of way for any extensions of this line through land owned by me, on condition, however, that this right of way should be utilized inside of five years. I will commence immediately to make leases and push my part of this contract with all promptness.

"Respectfully yours,                                   Thos. G. McKell.
                                                       "O. I."

McKell deeded to the company the right of way, turned over the surveys, established a mining plant, built coke ovens, and made leases of his lands to others for the production of coke on royalties paid to him. The railway company built the railroad. McKell and his lessees in due time elected to sell the coal to the railway company, instead of having it transported on their account. The business went on for several years upon the footing of the contract and the election of McKell and his lessees to sell their product. At length the railway company became dissatisfied. The burden of it became inconvenient. It declined to go further, and excused itself upon the ground that it had the right to terminate the contract if it should choose to do so.

Murray Seasongood and John H. Holt, for plaintiff in error.

Judson Harmon and Edward Colston, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and McCALL, District Judge.

SEVERENS, Circuit Judge (after stating the facts as above). It appears from the bill of exceptions that the presiding judge delivered an opinion in which he stated the grounds and reasons upon which he concluded that the plaintiff was not entitled to recover. This opinion is set forth therein, and shows that it was based upon a construction of the contract altogether different from that alleged in the petition. Taking it to be true that there was some kind of contract made. by the correspondence, he held that it extended only to such coal and coke as McKell himself should produce in a plant to be established on his land, and did not include the productions of others who might lease parts of his land, as to which he thought the language in the letter of Ingalls to McKell of March 31, 1892, imported an agreement that the company would make further contracts at the proper time, after McKell should have performed his contract by donating the right of way and putting in the coal and coke plants. Referring to this letter, the judge said:

"By the terms of the letter, whoever donated that right of way and constructed the two plants would be given the option of shipping for himself, at the lowest rate made to any parties, or of entering into a subsequent contract with the defendant company as to the disposition of not less than 100,000 tons per year. Assuming there was an agreement here entered into for the building of the road, I am of the opinion that under the contract the defendant company agreed to make another contract with the party or parties who donated the right of way and constructed a coal plant of not less capacity than 1,000 tons per day and coke ovens such as are mentioned in this letter of March 31, 1892, if such party or parties did not themselves elect to ship coal. It does not appear that such other contract was ever made."

And the judge went on to refer to the manner in which the parties by their subsequent acts and correspondence in the progress of their business, particularly the correspondence between the company and McKell and his lessees, indicating how the parties understood it, and in which the judge, admitting that sometimes it favored the interpretation claimed by one party and sometimes that claimed by the other, concluded that upon the whole it favored the construction which the judge put upon it.

It must be admitted that, if the contract was what the judge held it to be, there was no error in arresting the trial and directing a verdict, for it was not the contract alleged in the petition. We do not understand that this is disputed. But we are unable to agree with the learned judge in his interpretation of the agreement. We cannot think the parties intended to restrict their contract to a single mining plant to be established on his land by McKell and worked by himself, and did not include the production of other plants operated by other parties under leases made by McKell. On the contrary, it seems to us to have been contemplated that McKell would make leases to other parties in subordination to his contract and as an aid in the execution of it.

It is always of much importance in the interpretation of a contract, upon which doubt arises, to ascertain what was the attitude of the par-

ties to the subject, and to find out what was their main purpose and object in making it. If this can be done, the terms of the contract will be so construed as to promote the main purpose, if the language employed will fairly permit such construction. This statement of the general rule necessarily implies that explicit and positive language importing a different purpose cannot be overruled, but must be given its obvious meaning.

On looking at the preliminary letter of McKell to Ingalls, of March 28, 1892, we find that the former had theretofore foreborne the development of his coal lands lying on Dun Loup creek, and had been holding them as an investment. Now he was considering a plan to make them productive, the time seeming favorable. Several parties had proposed to take leases, and some proposed to build a railroad, leading from the defendant's railroad into this land, for the purpose of taking out the coal. Thereupon he suggests several propositions to the railway company, all of which he says are based upon the building of a railroad of about eight miles up Dun Loup creek; "also that operators on this branch shall have same in and out rates of freight on coal, coke, lumber, etc., as given to operators on main line on New River section." The first proposition was this:

"The C. & O. R. R. Co. to build and operate said branch. Receiving from me deed for right of way through land owned by me. Also my procuring or paying cost, if condemned, for right of way not owned by me. Receiving also from operators to be secured by me a guarantee of a tonnage of freight that will be satisfactory to you."

The other proposition contemplated the building the railroad by himself, to be operated either by himself or by the railway company. Again he says:

"It has been my opinion that cheaper coal and coke must be produced than possible on New River under costly method necessary on river front, or this coal and coke cannot maintain itself against close competition in dull times from more favorably located mines of other sections. If my revenue comes from royalties on the coal, more revenue will come to me if mines on my land can keep in the market at all times. If I want to sell any of my land, it will for the same reason bring a higher price."

The first proposition, above stated, was the one upon which the subsequent correspondence was based. It was in response to this letter that Mr. Ingalls wrote the letter of March 31, 1892, to McKell. The former knew what McKell's objects were, and his letter was manifestly intended to provide a means by which McKell could carry them out and at the same time effect a profitable contract for his own company. To effect this, he makes for his company the following offer:

"To build a branch of reasonable cost for any parties who will furnish the right of way and who will agree to put in a coal plant of not less than a thousand tons of coal per day and coke ovens that shall use one-third of the same, and who will furnish the coal at the same price as the Pocahontas people do."

This is the first part of the contract he proposes. He says "any parties." We think he has in mind that the right of way would be given by McKell, and that he, or those whom he should bring into relations with himself for operating the mines, would put in a coal plant and coke ovens of the capacity mentioned and would furnish the coal at

the price prevailing in the Pocahontas region. Else, why did he not name the particular party he was dealing with? He seems to have recognized that there would probably be other parties engaged in producing the coal. Then the offer proceeds, still speaking of the other parties in the plural:

"We will agree then to take from them at this price whatever amount of coal they agree to furnish, not less than 100,000 tons a year; or, if they prefer to ship it themselves, we will give them the rate made to any parties."

This is the second branch of the offer proposed. And we can find in it no ground whatever for restricting its intended operation to the first branch of the contract, or to the particular method of development, whether by men hired by McKell or by lessees under contract with him. Then, when these parties thought they had finished their contract, McKell says to Ingalls in the letter of April 26, 1892:

"I will commence immediately to make leases and push my part of this contract with all promptness."

The contract is roughly framed and very crisp, but we cannot perceive any serious difficulty in understanding it. Though it relates to a matter of importance, we suppose the manner of it is not unusual with men dealing constantly with large affairs.

Notwithstanding Mr. Ingalls supposed that the letters seemed "to correspond and clearly express our meaning," and that they "will form all the contract we shall need," and the parties conducted the business for years as if they had a contract, counsel for defendant now insist that there never was a contract, and in argument press the fact that there was never any written acceptance of the fresh conditions which they find in McKell's last letter of April 26, 1892. But it is a sufficient answer to this that the parties proceeded with their contract as if these supposed conditions were a part of it, and this was as effectually an acceptance as if they had been formally accepted.

Another point which is strongly urged and much dwelt upon in argument is upon the construction of the particular language in Mr. Ingalls' letter of March 31, 1892, where he says, "We will then agree to take from them at this price whatever amount of coal," etc., which they say means that the company will make a further agreement when the company shall have built its railway, and the other party shall have put in a coal plant and the coke ovens, the company will then agree, etc., and they attach the word "then" to the word "agree," and not to the words "to take," etc., and this seems to have been accepted as correct by the court below and made a basis of decision, for the judge said, concluding his discussion of the point, that "there never was a contract." But we regard this language as indicating a mere sequence, and imports that the company agrees that, when the things mentioned have been done, the company will do the things following. Besides, an agreement to agree to do a certain specified thing, as here, is nothing else than an agreement in præsenti to do it; all the conditions of the agreement postponed being specified. These parties seem never to have supposed that any such an agreement to make a further agreement on that subject had been left unperformed, and that they were

therefore going along without guide or compass. The argument upon this point is ingenious, but not persuasive.

Counsel for defendant also contend that the contract lacks the essentials of validity, in that it does not adequately express necessary conditions, such as place of delivery, amounts to be delivered per day or month, times of payment, and the like. But we think the intendments of the law are sufficient to supply all these details.

Again, it is urged by both parties that subsequent letters written and things done by them fortify their respective conclusions in regard to the proper construction of the contract; and it is undoubtedly true this is a species of evidence which ought to be resorted to in a case of doubt. As to this, it sufficiently appears from what we have said that we have felt no difficulty in arriving at the meaning of the parties in making this contract. But if this were not so, we should find little in the balance of opposing inferences to be drawn from the way in which the parties proceeded, to help us out. We are under an impression that the railway company, after the contract was made and its execution had progressed, paid more attention to it own interests than it did to the stipulations of the contract; and if the original plaintiff in the circumstances in which he was placed sometimes yielded to the company's requirements, it would not be safe or just to treat such concessions as an interpretation of the contract. One thing of considerable significance is that the president of the railway should have so frequently taken a hand in the choice of lessees and their conduct in the performance of their duties as such. If the contract did not include their operations, it is difficult to see what right the railway company had to meddle. Many letters passed between them while the business progressed, too many to warrant their insertion in this opinion. It must suffice to reaffirm what we have said that they furnish no clear indication of what the parties understood their contract to mean.

This brings us to the question which the learned judge passed by as not necessary to the determination of the case, but which he commented upon, and cited certain cases in a way which seems to indicate his view. That question is: What was the intended duration of the contract? It is the largest question, in respect to value, in the controversy, and was the one most fully argued at the hearing in this court. For the defendant, it is insisted that the contract was terminable at the will of either party upon notice given to the other. For the plaintiff, it is contended that it was to endure so long as the objects contemplated by it should remain unfulfilled; that is to say, so long as the plaintiff would furnish coal from his tract in quantities not less than 100,000 tons a year. No limitation is expressed in the agreement. And in such case the rule seems to be that neither party can terminate it without the consent of the other, unless the nature of the contract itself indicates with sufficient clearness that the parties must have intended some other determination. Turning again to the stipulations of the contract, we see how impossible it is to believe that the parties intended that it should be terminable at any time, when either party should be so minded. On the contrary, it seems perfectly

clear that they intended it should have a permanent duration. Its objects could not otherwise be fulfilled. What would the railway company have said if, after it had built the railroad and made ready to receive the coal, McKell had given it notice that he would neither sell the coal nor ship it by that road? Its disappointment would have been complete, and justly so. Or suppose the railway company, on McKell's having deeded the right of way, turned over the survey, and incurred the expense of making preparations for mining coal and making coke, should have refused to go on and take the coal as agreed, either for transportation at the specified rate, or purchase it at the specified price? It would undoubtedly have been a surprise to McKell and a reversal of his plans and expectations. He had relied upon the contract as the means of promoting his enterprise. What was to become of his leases, on which he relied for revenue?

Counsel for defendant exclaim earnestly against the probability of such an extensive contract as it would be if for all the coal in 25,000 acres, and that such a construction as the plaintiff contended for would impose a great hardship upon the railway company, and therefore it should not be admitted. But it does not appear what amount of coal was, or was supposed to be, in the tract, nor what amount the railway company would need to have for its own consumption or that of others which it might supply. The railroad was a permanent institution, and its want of coal would go on for many years. And it may be that the railway company was anticipating the disposition of what it did not want to use to others, and make profit in its transportation, and, perhaps, in the resale. It is well known that at that time such a course of business was not uncommon. But a more conclusive answer is that it should have been considered by the parties when they made their agreement whether it would impose too great a hardship upon them. The decisions upon the question we are now dealing with are not very numerous, but some of them are of high authority, and, if not controlling, are very persuasive. Some of which are cited in support of the contention for the plaintiff are Great Northern Ry. Co. v. Manchester, Sheffield, etc., Ry. Co., 5 De Gex & Sm. 138, decided by Vice Chancellor Parker in 1851, and said by Lord Justice James to have been the law of England since that time; Llanery Ry. & Dock Co. v. London & N. W. Ry. Co., L. R. 8 Ch. App. 942, affirmed by the House of Lords in L. R. 7 H. of L. 550, in 1875; Franklin Tel. Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Robson v. Mississippi Logging Co. (C. C.) 43 Fed. 364, affirmed by the Circuit Court of Appeals for the Eighth Circuit in 69 Fed. 773, 16 C. C. A. 400; and Western Union Tel. Co. v. Pennsylvania Co. (decided by the Circuit Court of Appeals for the Third Circuit) 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968.

In the case cited from 5 De Gex & Sm. 138, two railroad companies had mutually agreed to grant each other running privileges over their respective roads. There were no words in their contract fixing the duration of the agreement. The defendant contended that it was terminable by either party on notice to the other, and sought to avail itself of that privilege. But the Vice Chancellor held otherwise, and granted an injunction on a bill filed by the other party.

In Llanery Ry. & Dock Co. v. London & N. W. Ry. Co., the complainant had agreed with the defendant, for a sufficient consideration and upon specified conditions, to grant to it the privilege of running trains over its road. As in the preceding case there was in terms no limitation or restriction in respect to the time during which the agreement should be operative. The complainant took the ground that it was terminable by it on giving notice, and proceeded accordingly by giving three months' notice. The defendant, on the other hand, contended that it was a permanent and irrevocable contract, and resisted the contention of the Llanery Company. The controversy reached the Chancery Court upon a bill filed by the latter company to restrain the other from running its cars over the road of the Llanery Company and for a declaration that the contract had been terminated. The case was decided by the Vice Chancellor upon an indifferent question. But the parties by agreement waived this, and the case was taken to the Chancery Court of Appeals, where it was heard by James and Mellish, L. JJ., each of whom delivered an opinion affirming the defendant's contention that the contract was not subject to the will of either party, but was of mutual obligation and permanent in duration, and the bill was ordered to be dismissed. The complainant appealed to the House of Lords. The Law Lords who participated in the hearing were the Lord Chancellor Cairns and Lords Chelmsford, Hatherly, and Selborn. Counsel for defendant were stopped on the opening for the plaintiff. Each of the members delivered his own opinion, and the judgment of the Court of Chancery Appeals was unanimously affirmed. We have referred to this case thus fully because it seems directly in point and was argued and decided by lawyers and jurists of the highest reputation, and because, also, every point on the main question was elaborately considered. We cannot give space to an analysis of the opinions. In these two English cases the controversy was between railway companies, but there was nothing peculiar in the circumstances which affected the judgments. The discussions proceeded upon the general law of contract.

In the case of Franklin Tel. Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776, a bill was filed to obtain a decree restraining the defendant from terminating, or in any wise interfering with, the use by the plaintiffs of a telegraph wire upon the poles of the defendant between Philadelphia and New York, and requiring the defendant to maintain such wire in good working order for the use of the plaintiffs and their licensees. It was another mode of obtaining relief quite similar to that of a bill for specific performance of the contract therein alleged. The contract did not specify, as the majority of the court held, the time during which it should continue to be operative. The defendant had given notice of its purpose to terminate it. It is manifest that its right to do so was a vital question in the case. If it had such right, the plaintiffs could not maintain their case. The court, by Mr. Justice Harlan, among other things touching this point, said:

"If it was intended that Harrison Bros. & Co., having relinquished their valuable contract with the Insulated Lines Telegraph Company and put up the wire at their own expense, should become, after 10 years, only tenants

from year to year of the telegraph company, that intention, it seems to the court, would have been distinctly averred."

The court accordingly held that the contract was intended to continue permanently, and that the plaintiffs were entitled to the relief prayed. It was so held, notwithstanding the inconvenience which might result to the telegraph company.

In the case of Robson v. Mississippi Logging Co., the contract was between the owner of large tracts of land on branches of the Mississippi river, the Chippewa and Flambeau rivers, wherefrom he proposed to take the timber down the branches to the Mississippi, and there equip it for further transportation. To do this would require several years. The Logging Company agreed to do what was required. By the contract rates and terms and the annual payment of the amount due for each season's business were agreed upon. The Logging Company continued to perform its contract for seven years, and then, insisting that it had the right to terminate the contract at will, gave notice of its purpose. Robson thereupon brought an action for damages. To a petition alleging the contract and its breach, the defendant demurred because it appeared therefrom that the contract "was silent as to the time during which it should remain in force, and the defendant had therefore the right to terminate it at its pleasure, or upon giving reasonable notice." The demurrer was overruled upon an opinion filed by Judge Shiras, in which he discussed the question at some length. Subsequently the case was taken by writ of error to the Circuit Court of Appeals for the Eighth Circuit upon findings of fact and law by the trial judge, whereon a judgment had been entered for the plaintiff. The Court of Appeals affirmed the ruling of the lower court.

In Western Union Tel. Co. v. Pennsylvania Co. this subject was much discussed in an able opinion by Judge Gray, speaking for the court, upon a contract whereby the Pennsylvania Company agreed to furnish and set upon its line telegraph poles with arms, and the telegraph company was to furnish and string wire thereon for the joint use of the two companies. It was held by the Circuit Court of Appeals that, as no time during which the contract was to be operative was specified, it was not terminable at the will of either party, and the judgment of the court below, which refused an injunction against the Pennsylvania Company restraining it from violating the contract, was reversed.

Several federal Circuit Court decisions are cited by counsel for defendant in support of their construction of the contract, but they seem to us to be not entirely in harmony with the decision of the Supreme Court of the United States in the case of Franklin Tel. Co. v. Harrison, above cited, and not, in all of them, to sufficiently observe the sanctity of contracts deliberately made. The same observation may be made regarding the case of Stonega Coal Co. v. L. & N. R. R. Co., 106 Va. 223, 55 S. E. 551, 9 L. R. A. (N. S.) 1184. The case before us is to be differentiated from those which relate to contracts for personal service and special confidence, where there is an implication that the

parties intended that it should not be prolonged if either of the parties should become dissatisfied.

Another point urged for the defendant is that the contract exceeded the powers of the president of the company, and, further, that it was not within the scope of the defendant's franchise. As to the first, it seems quite clear that Mr. Ingalls was not merely the president, but was also the business manager of the company. Enough appears to show that in this matter at least he was allowed a free hand. But it further appears that subsequently the company acted with full knowledge of it. upon the assumption of the existence of the contract for several years, and at no time signified its dissent.

As to the objection that it was ultra vires of the company, we cannot perceive from anything in the record that it was so. Admitting for the sake of argument that the purchase of coal to sell again, and the motive was to thereby secure a profit by its transportation, would be outside of its charter powers, nevertheless the jury might regard the circumstances that the purchase of coal was a necessary incident to its proper business, and was likely to be so for a long time to come. How much it would require was impossible then to estimate. Extensions might be made, mergers effected, or other combinations made, requiring more of coal than its present needs, but of all these considerations the company would judge. The presumption would be that both parties intended a lawful contract, if there was no convincing proof to the contrary.

The judgment must be reversed and the cause remanded, with instruction to award a new trial.

Judge LURTON participated in the hearing and decision of this case, but is not now a member of the court.

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes