---

### McKELL v. CHESAPEAKE & O. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. January 9, 1911.)

#### No. 1,977.

1. CONTRACTS (§ 216*)—CONTINUING CONTRACTS—DURATION—TERM FIXED BY IMPLICATION.

It does not necessarily follow that, because a continuing contract does not fix the time of its duration, it may be terminated at will by either party, nor is it necessary that a contract shall definitely fix the period of its duration, even when it is not intended to be of unlimited duration, but it may supply the term by implication; and, where by a contract between an owner of coal land and a railroad company the landowner agreed to develop mines on his land, and the company agreed to purchase the coal produced at the ruling price of a certain other coal "not less than 100,000 tons a year," although the contract fixed no time during which it should continue in force, it would by implication terminate when the owner's coal became exhausted, so that the stipulated quantity per year could not be furnished.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 996–1010; Dec. Dig. § 216.*]

2. CONTRACTS (§ 56*)—CONSIDERATION—MUTUAL UNDERTAKINGS.

Where, by a contract, the owner of coal land agreed with a railroad company to develop mines thereon to produce not less than 1,000 tons per day, to coke a certain part thereof, and to furnish free right of way for a branch line from the company's line to the land, while the company agreed to build the line and to take as much coal as the owner would agree to furnish, not less than 100,000 tons a year, at the ruling price of a certain other coal, the several undertakings on one side furnished a sufficient consideration for all those on the other.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 344; Dec. Dig. § 56.*]

3. CONTRACTS (§ 59*)—CONSTRUCTION—CONTRACT GIVING OPTION.

Such contract gave the landowner the option, based on a valuable consideration, to furnish as much more than the minimum quantity of coal

required as he might from time to time elect, without further agreements therefor.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 348; Dec. Dig. § 59.*]

**4. CONTRACTS (§ 123*)—VALIDITY—PUBLIC POLICY.**

A contract by a railroad company with a private individual, based on a valuable consideration, by which it agrees to build, maintain, and operate a spur track to certain coal mines is not invalid as contrary to public policy, where its performance does not interfere with any of the company's duties to the public.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 570–575; Dec. Dig. § 123.*]

**5. CORPORATIONS (§ 446*)—CONTRACTS—VALIDITY.**

A railroad company cannot avoid a contract for the purchase of coal, for which it has a legitimate use, on the ground that it bought for the purpose of reselling it, which was not within its charter powers.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1785; Dec. Dig. § 446.*]

On rehearing. Former judgment adhered to.

For former opinion, see 175 Fed. 321, 99 C. C. A. 109.

Holt & Duncan, Brown, Jackson & Knight, and Paxton; Warrington & Seasongood, for plaintiff in error.

Harmon, Colston, Goldsmith & Hoadly, F. B. Enslow, and A. W. Goldsmith, Jr., for defendant in error.

Before SEVERENS and KNAPPEN, Circuit Judges, and McCALL, District Judge.

SEVERENS, Circuit Judge. On January 4, 1910, we announced and filed the opinion in this case which is reported in 175 Fed. 321, 99 C. C. A. 109, and in pursuance of which a judgment for reversal and for a new trial was entered. On the petition of the defendant in error, and mainly on account of the importance of the case· and of the principles involved, we granted a rehearing. The whole case has been thoroughly and ably reargued.

It is an action upon a contract which the plaintiff says the defendant made with her husband, the original plaintiff, for the purchase of the coal in a tract of land owned by him on Dunn Loup creek in the state of West Virginia. The contract alleged was made by correspondence between McKell and M. E. Ingalls, the president of. the Railway Company, in March and April of 1892. The conditions which induced it and the objects which the parties had in view are fully stated in the preface to our original opinion, and a reference thereto will relieve us from repetition. We will summarize McKell's first letter to Ingalls of March 28, 1892, by saying that he had for several years owned a tract of coal lands in West Virginia, and that he wished to make his investment productive. After stating various methods which had occurred to him as practicable, he solicited from Mr. Ingalls his view as to how. he had best proceed, and proposals of some agreement by which his object could be effected. Mr. Ing-

alls on March 31, 1892, replied to this letter; and, as it constitutes the main basis of the controversy, we reproduce his reply:

"Mr. Thomas G. McKell, Chillicothe, Ohio.

"Dear Sir: I am in receipt of your communication of the 28th. Of course, if you build a railroad up Loup Creek and connect with us we shall be glad to do business with you, as we are with every branch that connects with us. If, however, you desire us to build it, in connection with the development that you may make in the coal business, I think we have about come to the following conclusion; that we will build a branch of reasonable cost for any parties who will furnish the right of way and who will agree to put in a coal plant of not less than a thousand tons of coal per day and coke ovens that shall use one-third of the same, and who will furnish the coal at the same price as the Pocahontas people do. We will agree then to take from them at this price whatever amount of coal they agree to furnish, not less than 100,000 tons a year; or, if they prefer to ship it themselves, we will give them the lowest rate made to any parties. We think that any new developments made should be upon the basis of Pocahontas region, as it is only by getting the coal at the same price it is furnished there that we can hope to compete.

"I trust that you may be able to work on one or the other of these plans and develop your property.

"Very truly yours,                    M. E. Ingalls, Pres."

McKell by letter of April 25, 1892, accepted these propositions in the alternative that the Railway Company should build the road, and upon his understanding that the guaranty of 1,000 tons per day meant working days, and the work not prevented by strikes, etc. On the day following Mr. Ingalls addressed a letter to McKell, saying that his own letter of March 31st and McKell's of April 25th "together seem to correspond, and clearly express our meaning." But he also wishes to "add one or two verbal understandings." The first, and only material one, was:

"It is understood that you turn over to us the surveys which you have had made and that you will give us the right of way for any extensions of this line that we may want to build, or any branches, where they go over your land."

And the letter concludes:

"If these are as we agreed and as you understand them, kindly answer, and the letters will form all the contract we shall need."

McKell replied the same day, saying that he would turn over the maps and surveys, and would give the "right of way for any extensions of this line through land owned by me, on condition, however, that this right of way should be utilized inside of five years." The correspondence ended here, the contract was closed, and the parties proceeded with its execution. The Railway Company by its conduct in thus proceeding without dissent must be deemed to have acquiesced in McKell's requirement that the railroad extensions should be made within five years.

The president of the Railway Company had ample power to make the contract. One of the by-laws of the company, adopted at a stockholders' meeting, provided that:

"The president shall have general charge, control and supervision of all the business and affairs of the company, and over all its officers, agents and employés."

Moreover, this very contract was recited as of force in a coal contract with McKell's lessees approved by the board of directors on June 30, 1893. And as late as June, 1900, President Stevens, in answer to McKell's complaints that the Railway Company was not living up to its contract, and suggesting an arbitration, addressed to him the following letter:

> "Chesapeake and Ohio Railway Company,
> President's Office.
>
> "Geo. W. Stevens, President.
>
> "Mr. T. G. McKell, Chillicothe, Ohio.          "Richmond, Va., June 11, 1900.
>
> "Dear Sir: I have yours of the 8th instant. After a careful review of the points made by you, I cannot see in what particular the Railway Company has violated its contract, except, perhaps, in declining to take the entire output of coal that is being mined on your land, which the company is prohibited from doing by law. We are exceedingly desirous of cultivating and maintaining friendly relations with you, and trust that you will appreciate our present situation, and will not do anything that will cause friction in future. We should not consent to arbitration without knowing more definitely what questions are to be arbitrated.
>
> "Yours truly,                               Geo. W. Stevens."

The contract was never disaffirmed by either party in respect to any part or parts of it until the company attempted to relieve itself from some of them. And no ground for escaping its obligations was ever suggested, except that it was an impossibility for the company to perform it, and again, that its performance would be unlawful, until after the suit was commenced.

This suit was commenced March 4, 1902. The petition set forth the contract as the plaintiff claimed it to be and alleged its breach by the defendant. The answer of the defendant in its first defense, denied that it made such a contract, admitted that the plaintiff turned over the maps and surveys and conveyed to the Railway Company rights of way, and that the company built a railroad of eight miles in length and certain extensions, but denied that any of these things were done under the contract alleged in the petition; denied that the plaintiff had performed the conditions imposed upon him by the contract set out in the petition, denied that the plaintiff elected to sell all the coal to be mined on his land; denied that it received any coal under the alleged contract; denied that it had refused any coal in violation of any contract it had with the plaintiff; and denied all other allegations of the petition not admitted. For a second defense, it denied that the defendant had lawful authority to make such a contract as was set out in the petition. For a third defense it denied that the president had authority to make the contract.

At the trial the plaintiff proved the letters above referred to, and the by-law of the company delegating the powers to the president, and tendered further proof in support of the allegations of the petition including the breach thereof and the damages sustained. At this stage of the proceedings the court arrested the trial and directed a verdict for the defendant, being of opinion that the letters did not bear the construction claimed by the plaintiff, but led to the conclusion that:

"Assuming there was an agreement here entered into for the building of the road, I am of the opinion that under the contract the defendant company agreed to make another contract with the party or parties who donated the right of way and constructed a coal plant of not less capacity than one thousand tons per day and coke ovens such as are mentioned in this letter of March 31, 1892, if such party or parties did not themselves elect to ship coal. It does not appear that such other contract was ever made."

And therefore that the contract alleged was not proven. If the judge's opinion was correct, the course pursued was proper.

Owing to the fact that the production of evidence by the defendant was precluded by the action of the court, it is obvious that we are restricted to the consideration of the case made by the plaintiff and the tendency of the evidence produced by that party; for, if the evidence had any fair tendency to prove the allegations of the petition, its weight was for the consideration of the jury, even if the proof was to stop at that stage of the trial. And so, also, further evidence may be adduced to show the understanding of the parties as to the existence of a contract governing their conduct, and, if there was, what their understanding of its stipulations was.

The construction which the court put upon the contract was one which the parties themselves do not appear to have ever thought of during the eight or ten years they were operating under it, and, it seems to us, is wholly unwarranted. The object which the parties had in view would not have been secured. Neither of them could have contemplated that the recompense for the very considerable outlay which they undertook to make should depend upon the willingness of either of them to make some other contract. And the defendant itself was the least likely to take such a risk. If McKell should have concluded that some other way of developing his coal lands and disposing of the coal would be more to his interest, and had broken away from his relations to the company, could it be doubted that he would be liable to an action for damages, or to a remedy in equity? If the language of the contract were doubtful, the maxim of construction that the law will assume is that the parties intended that their purpose should bear fruit, rather than that it should prove futile. Thus the defendant's counsel say that when Mr. Ingalls in his letter of March 31st says, "We will agree then to take from them at this price," he intended the word "then" to designate the time when we "will agree," and not, as the plaintiff contends, to designate the time when we will take their coal. Standing alone and uninfluenced by any internal signs, or any external circumstances, it must be admitted that this language might bear either construction. But, when read in its context and in view of the circumstances and the objects of the parties, it is at once seen that the defendant's interpretation would make the whole scheme of the contract break down at the period when they should approach its substantial object and no further obligation would rest upon the parties. Moreover, there was no need of any further contract. The price had been fixed, namely, the Pocahontas market price—and the quantity had been fixed, namely, 100,000 tons a year, and as much more as McKell would elect to deliver. And Mr. Ingalls rightly said in conclusion, "The letters will form all the contract we shall need."

In our former opinion we discussed this subject at much length, and we shall forbear to prolong the discussion further than to state our conclusion that the possible literal construction which the court put upon some of the words in Mr. Ingalls' letter of March 31, 1892, is opposed to the many controlling reasons why such a construction should not be adopted; and to briefly indicate some further considerations leading to the same result. It jeopardizes the object which the parties had in view, and is antagonistic to the construction which the parties put upon it when they proceeded to carry it into execution. The letter itself shows that the coal to be furnished was to be not less than "100,000 tons a year." And McKell's reply of April 26, 1892, grants the right of way for extensions, but requires that the extensions must be made "within five years." But counsel now say that another contract after the preliminaries were accomplished was intended. An afterthought thus constructed which subverts the basis upon which the parties have acted ought not to prevail, unless it is founded upon very clear and indisputable reasons.

We come now to the suggestion that for other reasons than those the defendant had ever suggested, or the court assigned, the ruling of the court below was right. If these reasons are valid and conclusive, the judgment ought not to be reversed. Counsel for the defendant as a keynote say:

"We claim there was no contract of the Railway Company to purchase coal from McKell; but that, if there was such contract, it was to purchase only the output of the single plant referred to in the letter of March 31, 1892. Defendant did purchase that output from one of plaintiff's lessees."

With regard to the first of these propositions, we do not deem it necessary to repeat what we said in our former opinion, and have in part here repeated. The other propositions come so nearly to the view taken by the court below that we think they are covered by what we have said in regard to the construction of the contract there adopted. There is one argument, however, which was much pressed by one of the counsel for defendant which we ought to notice and this seems the proper place. It is urged that it is highly improbable that the president of the Railway Company would enter into a contract of such prodigious proportions as the purchase of all the coal under 25,000 acres. And at first thought it would seem so. But, when we come to look into the circumstances, the impression fades away. It is not to be admitted that the mere magnitude of a contract when the performance of it is possible is any reason why it should not be enforced. It is only a make-weight in determining whether such a contract was made. For that purpose it may be considered. The proof shows that in the year 1893 the company used, for its locomotives only, 502,535 tons of coal, and that the quantity increased during succeeding years until in 1904 it used for that purpose alone more than 1,000,000 tons, and that it increased from that time on, to the extent that it used for its locomotives, shops, stations, and tugs in 1908 1,392,484 tons, a good-sized train load for each day in the year. These figures serve to show what Mr. Ingalls may have contemplated for the future, and what he was making provision for. And it would

be a convenience to the company to make sure of a large and convenient supply, and at a price not larger than that prevailing from time to time in that locality. It was because Mr. Ingalls was so much impressed by the value of the contract he was making that, whereas on March 31st he had only secured a minimum of 100,000 tons a year, he, by his letter of April 26th following, exacts of McKell a stipulation that he will prepare himself to deliver three times that quantity. And this requirement is a clear recognition of McKell's right to elect to deliver more than the stipulated quantity.

Another term of the contract shows beyond doubt that the parties were not intending to limit their contract, as now contended, to the preparatory period while they were getting ready to do business. By the fourth paragraph of the letter of Mr. Ingalls of April 26, 1892, he makes it a condition:

"That you will commence on the coal development at the same time (that is, as we begin the building of the railroad) and push it as fast as is consistent with economy and the weather, until it reaches the amount per day, to-wit, 1,000 tons per day."

It is further urged that there was no time fixed for the duration of the contract, and that, in such case, either party may determine it upon giving notice of its intention to the other. It is not true that such a result would always follow. It would not follow when the nature of the contract shows that the parties intended it to be permanent. This is shown by the cases cited from 5 De Gex & Sm. 138, L. R. 8 Ch. App. 942, and L. R. 7 H. of L. 550; Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Western Union Tel. Co. v. Penn. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968, in our former opinion. Among the Circuit Court decisions to which we there referred (175 Fed. 332, 99 C. C. A. 109) are the cases of Baltimore & O. R. Co. v. Ohio & M. R. Co. (not reported) and Chattanooga R. & C. R. Co. v. Cincinnati N. O. & T. P. Ry. Co. (C. C.) 44 Fed. 456, both cases decided in this circuit, the former by Jackson, Circuit Judge, and the latter by Key, District Judge. The latter case was decided upon the authority of the former. Both cases have been cited by counsel for defendant, and it must be admitted they are not in harmony with those upon which we relied. But both of them were decided before the decision of the Supreme Court in Franklin Tel. Co. v. Harrison. We cannot doubt that if this later case had been earlier, and had been brought to their attention, the judges would not have held as they did. Nor is it necessary that a contract shall definitely fix the period of its duration, even when it is not intended that it shall be of unlimited duration. It may itself by implication supply the term of its duration. It would in many cases be implied that it was to be terminated when its object had been accomplished and all had been done that was agreed to be done. So here, when the plaintiff's coal should be exhausted, the end of the performance of the contract would be reached.

Another contention is that the stipulations of the contract do not impose mutual obligations upon the parties, and that for such reason the contract is void. This proposition can have no other relevant

meaning here than that some of the stipulations are not supported by a sufficient consideration. The contention cannot be sustained. Each of the several undertakings on one side is a sufficient consideration for each and all of the undertakings on the other, and is not to be attributed solely to any one of the things agreed by the other side, although both concern the same matter.

Again, it is contended that the contract is void for uncertainty. The particular stipulation which is said to be void on this account is contained in the letter of Mr. Ingalls of March 31, 1892, and reads as follows:

"We will then agree to take from them at this price whatever amount of coal they agree to furnish, not less than 100,000 tons a year."

It is urged that this does not require of McKell the delivery of any definite quantity of coal beyond the 100,000 tons a year. In taking up this inquiry we should approach it in the spirit of the maxim above referred to, that when the language of contracting parties is susceptible of differing constructions, and one of them will make it valid and will effectuate the intention of the parties, and another construction will not, the former should be adopted, especially should this be so where the parties have proceeded in the execution of the contract upon that construction. The court may do more mischief than justice if it carries the parties back and plants them upon a construction which the court might think the better one. Broom, in his Legal Maxims, at page 521, translates this maxim thus:

"A liberal construction should be put upon written instruments, so as to uphold them if possible, and carry into effect the intention of the parties."

He then proceeds to say:

"The two rules of most general application in construing a written instrument are (1) that it shall, if possible, be so interpreted ut magis valeat quam pereat; and (2) that such a meaning shall be given to it as may carry out and effectuate to the fullest extent the intention of the parties."

Guided by this rule, we observe that it is hardly to be supposed that Mr. Ingalls intended that every time a delivery should be made it should be preceded by a new contract to deliver it. The essential point was that the contract was to cover all the coal the plaintiff would in fact deliver, and that the true meaning of the parties was to include all the coal which the plaintiff would be willing to deliver, and that this meaning should prevail over the literal interpretation of the word "agree." Let it be observed that the proposition of Mr. Ingalls, when accepted, bound the parties, the one to furnish and the other to take, at the price stated, at least 100,000 tons a year. It extended an election to McKell to furnish as much more of the coal as he would agree to furnish. This option was not one which was expected to be acted upon at once for the whole period of the contract, as it might be if the coal was on hand and ready for immediate delivery, but was a continuing option which was intended to be operative as the execution of the contract progressed. That the parties understood this to be so is manifest from their conduct. The Railway Company at no time required of McKell any definite statement of

the additional amount he would agree to furnish, and never refused to take coal upon the ground that there had been no agreement defining the additional quantity of coal he would furnish, and the tender of the coal was treated as an election to furnish it. This stipulation giving him an election rested upon a valuable consideration, received when the contract was made. The price was fixed. The time was concurrent with the performance of the contract. The fact that the agreement upon this branch of the contract was unilateral and bound only the railway to take the additional coal while it did not bind McKell to furnish any beyond the specified amount does not defeat its binding obligation. A contract which is bilateral in its stipulations when made frequently becomes unilateral upon the performance of the stipulations of one of the parties which were the consideration for the stipulations of the other. It was the purchase of a privilege which McKell might exercise as the performance of the contract progressed. It is manifest from the letter of Mr. Ingalls of March 31, 1892, that he contemplated (and for that matter desired) that McKell would exercise it; for, while he stipulated for a minimum, no intended maximum was mentioned. For an illustration, let us suppose a man agrees to buy of another 10,000 bushels of grain in his storehouse containing a much larger quantity at a certain price per bushel, and in the contract of sale and as part thereof he agrees that the vendor shall have the right to deliver him as much more of the same grain in the storehouse, or the whole of it, at the same price, as the vendor would elect to deliver. Could it be doubted that the vendor would have the right to include as much more as he should elect? In such case, the subject-matter being ready for delivery, the election must be made within a reasonable time. The only difference between that case and this is that here the right of election continued with the performance of the contract and was to be exercised concurrently therewith. It is of the essence of an option given for a consideration that only one of the parties is bound. The other has purchased a privilege to extend the contract to as much more as he will, subject to the limitation that it shall not extend to other property than that with which the contract is dealing. In Wheeler v. New Brunswick & C. R. Co., 115 U. S. 29, 5 Sup. Ct. 1061, 1160, 29 L. Ed. 341, one of the terms of the contract was an agreement of the buyer that he would accept from the vendor any amount of old rails between 200 tons and 600 tons. The Circuit Court held that this gave an option to the vendor to deliver any amount between those two quantities. As to this the Supreme Court by Mr. Justice Miller said:

"We concur with the Circuit Court in holding that when Wheeler & Co. say 'we have bought of you (the railroad company) from two (2) to six hundred tons for delivery in New York or New Haven between August 1st and October 1st' that they agreed to accept any amount of old rails between those limits. The company was selling old rails. It knew that by August it would have a thousand tons. It did not know how much more they would have by October 1. It intended to secure the sale of what it might have between two hundred and six hundred tons."

As we have said, when a contract contains several mutual stipulations, each stipulation on the one side is a consideration, in part, and

of itself, sufficient to support the several stipulations on the other side. Hence the agreement of McKell to cede the right of way, to establish the plant, and to grant the right of way for such extensions as the company might require were a sufficient consideration to support the several stipulations of the Railway Company; and one of these was to take at the price stated not merely 100,000 tons a year of the product of the plaintiff's mines, but so much more of it as the plaintiff might elect to deliver. We repeat, it was a continuous option, for which the plaintiff paid.

When the object of the contract is perpetual in its nature, its intended duration must be deemed to correspond, as in several of the cases cited in the original opinion. It was to such cases that the Lord Chancellor Cairns had reference in his opinion delivered in the House of Lords in the Llanelly Railway & Dock Co. Case in L. R. 7 H. L., when he said at page 560 that such an agreement "must in its nature be an agreement which should have a continuing operation unless some power is given on the face of it to the parties to terminate the agreement." Lord Selborne made a similar observation in his opinion in that case at page 567. In such cases the court will hold that the contract was not determinable. But the contract is not void on that account. However, this contract did contain a necessary limitation resulting from the nature of its subject.

It was pressed upon us that the contract was void as against public policy, in that it required the Railway Company to build and maintain the spur railroad which out of regard for its public duty it had a discretion to maintain or not, and such cases as Texas, etc., Ry. Co. v. Marshall, 136 U. S. 407, 10 Sup. Ct. 846, 34 L. Ed. 385, and Jones v. Newport News Co., 65 Fed. 736, 13 C. C. A. 95, are appealed to. But that doctrine has no application here. It rests upon the ground that the public has an interest to be protected, and that the service to the public will be interfered with by the performance of the contract. But here the public had no concern with anything the Railway Company agreed to do. Its lines for traffic in the carriage of freight and passengers were in no wise endangered. The building and operating the spur were but the means to an end—that is to say, the transportation of the coal from the place of delivery to its main line—and that would be its own business which the company must provide for. Much stress is laid upon the decision of this court in the case of Jones v. Newport News Co., just mentioned. But reference to that case will show that, not only was there no contract for the permanent maintenance of the switch, but that its relation to the main line "was one of probable, or possible, danger to the public using the railroad, and to justify its determination for that reason."

Defendant's counsel also rely upon the decision of Judge Taft, then a circuit judge for this circuit, in the case of Mercantile Trust Co. v. Columbus S. & H. R. Co. (C. C.) 90 Fed. 148, upon an intervening petition of the owners of mines upon a spur track extending beyond the railroad company's station on a branch of their railroad. The petitioners prayed for an injunction. The company had reserved a discretion to fix a station at the end of the branch, and it had fixed

the terminal station at the place from which the spur extended. But it also laid a track on this spur toward the petitioner's mines and operated it for a time. The receiver of the railroad was threatening to discontinue the spur and take up the track. Having stated these facts, Judge Taft said:

"The question presented is whether a railroad company may discontinue switch or spur tracks built by it for the purpose of bringing business to its road when the contract under which the spur was built contains no express obligation to continue its operation for a definite time or forever."

"The contract," said he, "does not contain any express stipulation by the railroad company that it will keep and operate its spur track for any definite time." And the petition was denied. The contract referred to by the learned judge was not a contract with any private party, but was one with the public, predicated upon a resolution of the stockholders, made under the provision of a statute, to build a branch railroad to a point near to a place designated by the resolution; and the company exercised its discretion by fixing the terminus at the station from which the spur was extended. If the spur had been built under a contract made with a private party for a valuable consideration, no public interest being affected, an entirely different case would have been presented. A railroad company has no discretion to violate its private contracts unless some public duty forbids their performance. There are many cases in which it has been held that the court will not control the discretion of a railroad company where its exercise is necessary to the proper discharge of a public duty. The case of Texas, etc., Railway Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385, is a leading authority in the federal courts upon this subject and has often been cited in state, as well as federal, decisions. But it would be an unwholesome abuse of that doctrine to allow a railroad company to use it as a shield for defense against its liabilities on a purely private contract, the performance of which can be enforced without in any way disabling it from performing its public obligations. In such a case the rules governing private contracts have full force. If it were not so, railroad companies would find themselves confronted daily with obstacles which would be insurmountable. The public would hesitate to deal with so irresponsible a party.

A decision that such a contract as this would be void for such a reason would be in absurd contrast with the judgments in the two English railroad cases above referred to and in the two cases decided by the Supreme Court in Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776, and the still earlier case of Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843, in all of which the contract involved much more intimate physical relation with the railroad and therefore imposing more restraint than was contemplated by this contract of the railway company, which was really none at all.

A kindred defense here made is that the contract was illegal because the Railway Company was buying this coal for the purpose of selling it. We referred to this subject in our former opinion. But it

seems fitting that some further observations should be made concerning it. If we were to assume that the Railway Company bought this coal for the purpose of speculating with some of it, still this would not invalidate the contract, if McKell had no further relation to it after he had delivered the coal and the company had a lawful and proper use for it. Whether the company should use or sell it was a matter for the company's subsequent determination. His sale of the coal was a perfectly lawful transaction. A further disposition of it by the vendee might be ultra vires, but the plaintiff would be no party to it. However, there seems scant ground, considering the company's own requirements, for its confession of an unlawful purpose in securing the coal.

We find no sufficient reason for a different conclusion from that reached on the former hearing. The result is that the judgment then given will not be disturbed.

KNAPPEN, Circuit Judge, concurs in the conclusion that the judgment of the Circuit Court should be reversed and a new trial ordered.