Arkansas Valley Town & Land Co. v. Atchison, T. & S. F. Ry. Co.

# ARKANSAS VALLEY TOWN & LAND CO. v. ATCHISON, T. & S. F. RY. CO.

### No. 3794.   Opinion Filed October 12, 1915.

### Rehearing Denied October 12, 1915.

#### (151 Pac. 1028.)

**CONTRACTS—Breach—Unenforceable Contract.** Plaintiff sued defendant railway company, seeking a recovery of damages in the sum of $1,000,000, for the alleged breach of a purported contract, the material parts of which are as follows:

"That the party of the first part shall at his discretion, subject to approval as hereinafter provided, obtain, by purchase or otherwise, sites for towns and depots along the lines of the railroads owned, leased, or controlled, or to be hereafter owned, leased, or controlled, by the party of the second part, and shall locate and lay out such town sites, and all lands so obtained not conveyed to the party of the second part as hereinafter provided shall be sold from time to time at the discretion of the party of the first part, his heirs and assigns, on the best possible terms.  *  *  *  No land shall be purchased by the party of the first part without the consent in writing of the president of the party of the second part.  For each town site a separate account shall be opened, and when the original cost of land purchased in said town site shall have been received by the party of the first part from the proceeds of sales of lands or otherwise, the net proceeds of all subsequent sales are to be equally divided between the parties of the first and second part. In making up accounts, nothing shall be charged by the party of the first part for interest or general expenses of any kind."

**Held,** that said purported contract is too indefinite and uncertain, as applied to the subject-matter, to constitute an enforceable contract authorizing the recovery of damages for an alleged breach thereof.

(Syllabus by the Court.)

*Error from District Court, Logan County;*
*A. H. Huston, Judge.*

Action by the Arkansas Valley Town & Land Company against the Atchison, Topeka & Santa Fe Railway

Company.   Judgment for defendant, and plaintiff brings error.   Affirmed, and petition for rehearing denied.

*Frank Doster* and *Dale, Amidon, Madalene & Hegler,* for plaintiff in error.

*Cottingham & Bledsoe* and *Samuel W. Hayes,* for defendant in error.

HARDY, J.   Plaintiff in error, Arkansas Valley Town & Land Company, brought suit in the trial court against defendant in error, Atchison, Topeka & Santa Fe Railway Company, for damages.   The parties will be referred to as they were in the trial court.   Defendant filed demurrer to the petition, which was sustained, and plaintiff brings error.

The amended petition alleged that on the 11th day of March, 1881, one Alden Speare entered into a written agreement with the Atchison, Topeka & Santa Fe Railroad Company relating to the purchase of lands along the lines of said railroad company for town-site purposes, and the location and laying out of said town sites, and the sale of lots therein for their mutual profit and advantage; that on the 1st day of July, 1895, said Alden Speare, in writing, assigned to plaintiff all his right and interest in said town-site contract, which assignment thereafter on the 5th day of August, 1895, was in writing ratified and approved by the said railroad company; that the contract referred to is as follows:

"This agreement made this 11th day of March, A. D. 1881, between Alden Speare, of Newton, in the commonwealth of Massachusetts, party of the first part, and the Atchison, Topeka & Santa Fe Railroad Company, party of the second part, witnesseth:   That the said party of the first part does hereby, for himself, his heirs, executors, administrators, and assigns, covenant and agree with the

party of the second part, its successors and assigns, as follows:

"That the party of the first part shall at his discretion, subject to approval as hereinafter provided, obtain by purchase, or otherwise, sites for towns and depots along the lines of railroad owned, leased, or controlled, or to be hereafter owned, leased, or controlled by the party of the second part, and shall locate and lay out such town sites, and all lands so obtained not conveyed to the party of the second part as hereinafter provided shall be sold from time to time at the discretion of the party of the first part, his heirs and assigns, on the best possible terms. When the land to be purchased as aforesaid is owned by others than the party of the second part, the party of the first part shall purchase the same on the best possible terms, and whenever any such land is wholly or partially owned by the party of the second part, the party of the first part shall pay therefor the price at which the land shall be valued on the books of the land commissioner of said party of the second part at the time of said purchase: Provided that such valuation shall in all cases be made after a road owned, leased, or controlled by said party of the second part has been located through the land purchased. All payments for such land shall be made to the party of the second part in cash and without the discount allowed to others who buy land for cash.

"The party of the first part shall from time to time, on request of the party of the second part, convey to said party of the second part, free of charge, whatever land obtained by him by purchase, or otherwise, from the party of the second part, or any other person or persons, it may need for depots, machine shops, yards, or other purposes connected with its business, not exceeding in all thirty acres in any one town site. No land shall be purchased by the party of the first part without the consent in writing of the president of the party of the second part. For each town site a separate account shall be opened, and when the original cost of land purchased in such town

site shall have been received by the party of the first part from the proceeds of sales of lands or otherwise, the net proceeds of all subsequent sales are to be equally divided between the parties of the first and second parts. In making up accounts nothing shall be charged by the party of the first part for interest or general expenses of any kind.

"In witness whereof the said Alden Speare has hereunto set his hand and seal, and the said Atchison, Topeka & Santa Fe Railroad Company has hereunto affixed its corporate seal and caused these presents to be signed by T. J. Coolidge, its president, hereunto duly authorized the day and year first above written. [Signed] Alden Speare. [Seal.] [Signed.] Atchison, Topeka & Santa Fe Railroad Company, by T. J. Coolidge, President. [Seal.] In the presence of [Signed] Geo. L. Goodwin."

Plaintiff then alleged the transfer of said contract by Alden Speare to plaintiff, and the assent and ratification by the defendant company, the mutual execution of the same according to its terms, and the plans agreed upon by the said Speare and his assignee, plaintiff, of purchasing lands for town-site purposes along the lines of defendant company, which purchases were approved by the president of said defendant company; that after conveying the required amount to defendant company for depots, yards, etc., the balance was laid out in blocks and lots and sold on the market, and the proceeds divided between plaintiff and defendant. Plaintiff alleged that defendant company, through its president and chairman of board of directors, acknowledged verbally and in writing that it had acquired said contract; that after the execution of said contract a course of business was adopted as follows:

"The general manager, civil engineer, or other chief officer of the defendant, or its assignor, notified the plaintiff, or its assignor, of the particular tracts of land which

said defendant, or its assignor, desired as a location for town sites, depot grounds, etc., for said chief engineer, or other officer, to give notice of the particular localities along said line of railroad in which he desired said locations to be made, and for the said plaintiff, or its assignor, on receipt of said notice, to proceed to the performance on its part of the purchase of the desired lands, and to the platting of the same into town sites, depot grounds, etc., and such method or course of business continued to be the plan of performance of said contract, and was relied on by plaintiff as such until its violation by said defendant as herein alleged."

Plaintiff further alleged that during five years preceding the institution of this suit the defendant company constructed and caused to be constructed for itself, and since said last mentioned date has owned and controlled, lines of railroad in the territory of New Mexico, and had established thereon numerous towns (naming them); that said defendant, at the time of the establishment of said towns, and at all times since, prevented plaintiff from buying the land and laying out such town sites by not notifying said plaintiff of its desire to have towns laid out along said lines of railroad, as had theretofore and hereafter alleged been the agreed and settled course of dealing between said two companies, and by concealing from plaintiff the fact that it (the said defendant) was ready to have and was causing such town sites to be located and laid out, and by procuring other corporations or individuals, without plaintiff's knowledge, to furnish lands and lay out said town sites, although plaintiff was ready at all times to so acquire land and lay out said town sites. It is alleged that after conveying to defendant sufficient lands for its use for depots, etc., the balance of said lands so used and to be used for town sites

was and continues to be worth the sum of $1,000,000, and that plaintiff was entitled to one-half of said amount. The exhibits which are attached to the petition are herewith set out as follows:

EXHIBIT A.

"Chicago, August 19, 1904.  Mr. A. G. Lewis, President, Topeka, Kansas—Dear Sir: I have your letter of the 10th inst., with inclosure. It is too much to attempt at this late date to say what was the full intent of the makers of the contract of March 11, 1881; but it is certain that the settlements so far made between our companies have been made in strict accordance with the wording of that contract. I can imagine a condition which might fully justify the interpretation which has apparently so far been placed upon the agreement; but in the face of the showing made by you to the effect that the Atchison Company has already received nearly $54,000.00 in profits more than has been realized by the land company, the reasonableness of your plan is difficult to dispute. I am willing, therefore, to accept your proposition and agree: First, that the contract of March 11, 1881, shall be construed for the purpose of this accounting only, to cover your operations thereunder as a whole, the Atchison Company to receive one-half of the total net profits of the Town Company; second, that further payments to the Atchison Company may be suspended until this basis is reached, that is, until the Town & Land Company has itself received additional profits of $53,753.79; thereafter the net profits of the Town & Land Company to be divided from time to time equally between the two companies, as provided in said contract of March 11, 1881, it being understood that the said contract is to remain in full force and effect, except as hereby modified for the purpose of this accounting. Copy of this letter goes to Mr. Wilder and Mr. Whitehead, so that they may be advised of this understanding. Yours truly [Signed] E. P. Ripley."

EXHIRIT B.

"June 26th, 1896. Mr. W. E. Putnam, President Arkansas Valley Town & Land Co., 95 Milk St., Boston, Mass.—Dear Sir: Your letter of May 25th, together with all papers and information at my command relating to the subject, has been submitted to our counsel and considered by our executive committee. The opinion of our counsel was that neither the Atchison, Topeka & Santa Fe Railroad Company nor the receivers nor the Atchison, Topeka & Santa Fe Railway Company became liable, under the contract between the Atchison, Topeka & Santa Fe Railroad Company and the Arkansas Valley Town & Land Company, to pay the Lincoln claim which is now presented by the Land Company. The only question is whether the Atchison, Topeka & Santa Fe Railroad Company became liable to pay this claim by virtue of the settlement made with the Land Company when the Richards town site was taken back by the railroad company. I do not think the papers establish an obligation on the part of the railroad company to pay this claim, although the fact that the claim was defended by the attorneys of the railroad and that the latter paid certain expenses incurred in the defense would raise an inference that the railroad company considered that it was liable. Assuming, however, that the railroad company did agree to protect the land company against the Lincoln claim, this would be merely an unsecured obligation of the railroad company and not a preferential claim. While in the opinion of our counsel your company has no legal claim against the Atchison, Topeka & Santa Fe Railway Company, nevertheless a disposition was manifested in the committee to treat this matter equitably, rather than in accordance with strict legal rights. They recognize the probability that, when the settlement was made with the railroad company concerning the Richards town site, your company expected to receive protection. They desire also to maintain friendly relations with your company in view of the existing contract which was acquired by us under the foreclosure sale. They therefore regard the Lincoln claim

which you present as a proper subject for compromise and are willing to meet the situation in a liberal spirit. I have been intrusted with the conduct of further negotiations for the settlement of the matter, and I would be pleased either to meet you for its consideration or to receive from you a statement of what your company feels itself willing to accept in full compromise of the claim. Would it not be fair for us to divide the loss with you? Very truly yours, Aldace F. Walker."

As a second cause of action plaintiff adopts paragraphs 1 to 8, inclusive, of its first cause of action, and, in addition, alleges that during the five years preceding the filing of this suit the defendant owned and controlled lines of railway in the territory of New Mexico and Arizona and in the state of Texas, and established and built towns along its said road, and that the net profits from the sale of lots thereof were $1,000,000. . Plaintiff prays judgment upon both causes of action in the sum of $1,000,000.

The question presented for our decision under the briefs and oral argument of counsel is the sufficiency of the contract in the following particulars: (1) Is the instrument sued on lacking in mutuality of obligation between the contracting parties, and therefore void; and, if originally void, was it thereafter vitalized and rendered obligatory by subsequent negotiations between the parties? (2) Is there such a lack of certainty concerning the subject-matter as to render the contract void for this reason? and (3) Does the contract create the relation of partners between the plaintiff and defendant; and, if so, is the contract void because against public policy?

Counsel concede the correct rule of law to be that, in order for a contract to be valid when not based upon a

49—10

consideration passing at the time, there must be a mutuality of promises by which each party has the right to hold the other to the performance of his promises; and, where no consideration passes at the time, and the contract carries no mutual obligations from each party to the other which can be enforced, the contract is void for such lack of mutuality. This proposition is so well established that it needs no citation of authorities.

Defendant in error says the contract is lacking in mutuality because it was provided by its terms "that the party of the first part shall, at his discretion, subject to approval as hereinafter provided, obtain by purchase, or otherwise, sites for towns and depots," etc.; and, construing this provision of the contract, they say it was optional with plaintiff whether it should secure sites or not, and that there was no binding obligation upon its part to secure all of the town sites or any particular portion thereof; while plaintiff contends that the contract bound it to procure sites, and the use of the term "at his discretion" was intended to refer to the manner or method by which such sites were acquired, as, for example, by purchase, gift, donation, or otherwise, or by paying cash therefor, or buying on credit, etc. Where the parties have dealt with each other under the terms of a contract for so long a time as is the case here, and the interests involved are of such magnitude, the court should search for reasons to uphold the contract and to carry out the intention of the parties, if it can be ascertained, rather than to destroy it, and in interpreting its terms may look to the surrounding circumstances to determine its validity and ascertain the intention of the parties thereto. When the parties enter into a contract, we should presume they intended something was to be done thereunder, and that

they did not purposely do a vain and idle thing, and therefore, if possible, it should be so construed as to uphold it. Section 953, Rev. Laws 1910, is as follows:

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties."

Section 957, Rev. Laws 1910, is as follows:

"A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

Section 962, Rev. Laws 1910, is as follows:

"Repugnancy in a contract must be reconciled, if possible, by such an interpretation as would give some effect to the repugnant clause, subordinate to the * * * intent and purposes of the whole contract."

Section 965, Rev. Laws 1910, is as follows:

"Stipulations which are necessary to make a contract reasonable or conformable to usage are implied in respect to matters concerning which the contract manifests no contrary intentions."

The language of the contract necessary to be considered in this connection is as follows:

"That the party of the first part shall, at his discretion, subject to approval as hereinafter provided, obtain, by purchase or otherwise, sites for towns and depots along the lines of railroad owned or controlled or to be hereafter owned, leased, or controlled by the party of the second part. * * * No land shall be purchased by the party of the first part without the consent in writing of the president of the party of the second part."

One of the definitions of "discretion," as given by Webster, is:

"The quality of being discreet; wise conduct and management; cautious discernment, especially as to matters of propriety and self-control; prudent; circumspection; wariness."

Keeping in mind the rules of construction given by the statutes referred to, and giving to the word "discretion" the definition quoted from Webster, the contract may be construed to mean that the party of the first part agreed to obtain town sites by "purchase or otherwise," at his discretion, and that it was in respect to the method of obtaining such sites, and not whether they should be obtained at all, that discretion was reserved. This will further appear when it is seen that by the language of the contract it is stipulated "the party of the first part 'shall' at his discretion," etc. The use of the word "shall" makes it imperative on his part to do this, otherwise the contract would have no validity for want of binding promises; and, when we consider the circumstances surrounding the making of the contract, the persons entering into it, the nature and magnitude of the business to be transacted, etc., we are compelled to presume that the parties were possessed of reasonable business ability, and were not drawing up this instrument as an idle pastime, and that the party of the first part did not undertake to do the things which he contracted to do only at his discretion. By transposing the language slightly, as courts are authorized to do, and are constantly doing; the language of this portion of the contract will be relieved of any doubtful meaning, and, when so transposed, would read thus:

"The party of the first part shall, subject to approval as hereinafter provided, obtain,, by purchase or otherwise, at his discretion, sites for towns," etc.

The language of the contract in other portions thereof indicates that the parties contemplated obtaining sites otherwise than by purchase, as shown by the use of the language, "whatever land obtained by him by purchase or otherwise." It was concerning these matters—that is, the manner of purchasing sites, and the terms of purchase, etc.—discretion was vested, and not as to whether they should be acquired at all. Nor does the fact that the contract provided that no land should be purchased without the consent in writing of the president of the party of the second part deprive the contract of mutuality in this respect. It was possible that not every proposed site selected by the party of the first part would prove satisfactory to the party of the second part. Reasons of public convenience, present and prospective traffic, engineering problems, etc., might enter into a consideration of the suitability of a proposed site, and for these reasons the party of the second part reserved the right to accept or reject a proposed location. This reservation, however, did not amount to a right to arbitrarily terminate the contract. The town company was bound to select the sites, looking to the mutual advantage of the contracting parties, and the railroad company was given the right to approve the selection, which it was bound to do when no sufficient reason appeared for its failure in that respect. This provision was evidently inserted for the purpose of securing harmony of action in the performance of the agreement by both of the parties thereto, and was not a reservation of power to destroy it, and the right of approval under the terms of the contract was to be reasonably exercised, and not arbitrarily; in other words, the selection by the town company should be made in such a way and to such an extent that a reasonable per-

son desiring the fulfillment of the contract would be satisfied with the selection, and would exclude all capricious and unreasonable dissatisfaction and disapproval *(Michigan Stone & Supply Co. v. Harris,* 81 Fed. 928, 27 C. C. A. 6; *Livesley v. Johnston,* 45 Or. 30, 76 Pac. 13, 946, 65 L. R. A. 783, 106 Am. St. Rep. 647; *Lockwood Mfg. Co. v. Mason Regulator Co.,* 183 Mass. 25, 66 N. E. 420; *Keeler v. Clifford,* 165 Ill. 544, 46 N. E. 248; *Hawkins v. Graham,* 149 Mass. 284, 21 N. E. 312, 14 Am. St. Rep. 422), and in giving or withholding approval of such selection it would be incumbent upon the president of the railway company to act in good faith in the performance of his duties looking to the common interest of both of the contracting parties, and not to arbitrarily withhold his approval from improper motives *(Harrah State Bank v. School Dist. No. 70,* 47 Okla. 593, 149 Pac. 1190; *B. & O. Ry. Co. v. Brydon,* 65 Md. 198, 611, 3 Atl. 306, 9 Atl. 126, 57 Am. Rep. 318; *Cook v. Foley,* 152 Fed. 41, 81 C. C. A. 237; *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520, 1 L. R. A. [N. S.] 1050; *Richison et al. v. Mead,* 11 S. D. 639, 80 N. W. 131; *Doll et al. v. Noble,* 116 N. Y. 230, 22 N. E. 406, 5 L. R. A. 554, 15 Am. St. Rep. 398; *May v. Hoover,* 112 Ind. 455, 14 N. E. 472), and the mere fact that the power of approval was reserved to the president of the railroad company, and not to the company itself, cannot alter the situation *(Edwards v. Hartshorn, supra; Michigan Stone & Supply Co. v. Harris, supra),* and should he, from improper motives, arbitrarily withhold his approval of a selection when made, upon showing this fact, the town company, if the contract were otherwise valid, would be entitled to relief.

Taking this part of the contract and considering it in connection with the entire contract and the surrounding circumstances, we cannot say that the contract was void for lack of mutuality in the promises and obligations of the parties in respect to the matters just considered. The contract, however, does not by its terms fix any period of duration between the parties, and its duration is indefinite, so that we are unable to determine just how long the parties contemplated that it should continue. This being true, it might be terminated by either party at any time. *Smith v. Cedar Falls & Minn. R. Co.*, 30 Iowa, 244; *Lawrence v. Robinson*, 4 Colo. 567; *Davis v. Fidelity Fire Ins. Co. of Baltimore*, 208 Ill. 375, 70 N. E. 359; *Dunham v. Orange Lumber Co.* (Tex. Civ. App.), 125 S. W. 89; *Joliet Bottle Co. v. Joliet Cit. Brewing Co.*, 254 Ill. 215, 98 N. E. 263; *Rosenblatt v. Weinman*, 225 Pa. 200, 74 Atl. 54; *Victoria Limestone Co. v. Hinton*, 156 Ky. 674, 161 S. W. 1109; *Carr et al. v. Louisville & N. R. Co.*, 141 Ga. 219, 80 S. E. 716; *Santaella Co. v. Otto F. Lange & Co.*, 155 Fed. 719, 84 C. C. A. 143; *Ingram-Day Lumber Co. v. Rodgers*, 105 Miss. 244, 62 South. 230, 48 L. R. A. (N. S.) 435; *Briggs v. Morris*, 244 Pa. 139, 90 Atl. 532; *Erwin v. Erwin*, 25 Ala. 236; *Howard v. East Tenn. V. & G. Co.*, 91 Ala. 268, 8 South. 868; *Smith v. Crum Lynne Iron & Steel Co.*, 208 Pa. 462, 57 Atl. 953; *Burton v. Kipp*, 30 Mont. 275, 76 Pac. 563; *Woolsey v. Ryan*, 59 Kan. 601, 54 Pac. 664; *Davie et al. v. Lumberman's Min. Co.*, 93 Mich. 491, 53 N. W. 625, 24 L. R. A. 357.

Plaintiff admits that this rule of law applies to contracts of agency, partnership, for the sale of personal property, and contracts creating fiduciary relationship, but says the contract in question does not fall within any of these classes, and that the parties are independent con-

tractors dealing with each other at arm's length, and the contract was in the nature of a grant irrevocable, because the period of ending was not specified therein, and therefore the contract is not governed by the authorities cited, and in support of this view cites the following cases: *Western Union Tel. Co. v. Penn. Co.*, 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968; *McKell v. Chesapeake & O. Ry. Co.*, 175 Fed. 321, 99 C. C. A. 109, 20 Ann. Cas. 1097; *Id.*, 186 Fed. 39, 108 C. C. A. 141; *Great N. Ry. Co. v. Manchester Ry. Co.*, 5 De G. & Sm. 138, 64 Eng. Rep. 1053; *Llanelly & C. Ry. Co. v. London & C. Ry. Co.*, 8 L. R. (Chan.) 942; *Wiggins Ferry Co. v. Chicago & Alton R. Co.*, 73 Mo. 389, 39 Am. Rep. 519. In our judgment, the authorities relied upon do not except the contract from the rule.

In *Western U. Tel. Co. v. Penn. Co.*, *supra*, the contract involved was for the construction of a line of telegraph along the right of way of the railroad company, and for the maintenance and operation of such telegraph line for the benefit of both companies. The court held the contract to be a grant of a license to construct the line along the right of way, and that by the expenditure of money in the construction thereof the company acquired an interest in the realty so that the license had become in the nature of an easement and nonrevocable.

In *McKell v. Chespeake & O. Ry. Co.*, *supra*, the contract was between the owner of certain lands and the company, by which the owner agreed to develop the mines on his land, and the company agreed to purchase the coal at the ruling price, not less in amount than 100,000 tons a year. The landowner agreed to furnish free right of way for a branch line from the railroad company's main line to the land, and the company agreed to build a line

and take such coal as the owner would agree to furnish, not less than 100,000 tons a year. This was construed to give the owner the option, based upon a valuable consideration, to furnish not less than the minimum quantity of coal specified per year until the coal beneath his land was exhausted.

In *Wiggins Ferry Co. v. Chicago & Alton Ry. Co.*, *supra*, by the contract the ferry company granted to the Alton & St. Louis Railway Company a site for a depot and right of way, and the Alton & St. Louis Railway Company agreed to give the ferry company the ferrying of all goods required to be transported between certain points, and the contract also contained an agreement which permitted its assignment.

In *Great N. Ry. Co. v. Manchester, etc., Ry. Co.*, *supra*, by the terms of the agreement the respective companies were given the right of running over the lines of the other, and certain costs and expenses were to be divided, and certain revenues were to be apportioned between the companies, and, in addition, the M. Co. ceded certain lands to the G. N. Co. In passing upon the case the Vice Chancellor, Sir James Parker, made the following observations:

"Then, if we look at the substance of the agreement, there is a great number of the terms of the agreement which are obviously permanent terms, and it is clear that the agreement as to many of the stipulations in it leaves the two companies permanently in a different position to what they were in before. One company agrees with the other that land is to be given up. The East Lincolnshire Railway Company agrees with the defendants that land . is to be given up permanently to them upon certain terms, and on the other side the defendants enter into stipulations with the East Lincolnshire Railway Company, one

of which is that they shall have facilities for convenient access to the Grimsby Docks; and there is also the stipulation in question that they shall have the right of running over the other line. Now, where you have an agreement of this kind, in which both the companies put themselves for value permanently in a different situation, it does appear to me it would be a very forced and unsound construction of the agreement to hold that, where there are permanent terms in it, putting the two companies forever in a different position to each other, you should construe every clause which confers rights of great value upon defendant companies as creating rights which are only to continue during the will of either party."

In *Llanelly Ry. & D. Co. v. London & N. W. R. Co.*, *supra*, it appears that the L. Co. was in want of money to complete an extension line, and applied to the N. W. Co. for a loan of £40,000, and it was agreed that N. W. Co. should loan the money and have running powers over the lines of the L. Co. An agreement under seal was entered into not referring to the loan, by which it was agreed that, subject to such by-laws and regulations of the L. Co. as should from time to time be in force, the N. W. Co. might run over and use the railways of the L. Co. and their stations, sidings, and conveniences; that the receipts from their traffic should be apportioned between the two companies according to mileage proportion, with a certain per cent. to the N. W. Co. out of the L. Co's. share; that the N. W. Co. might have their own staff at the stations of the L. Co.'s. lines; that, whether the running powers were exercised or not, there should be a complete system of through booking and through fares from the stations of each company by the lines of the other; that if the running powers were exercised the fares should be used by the N. W. Co., and if the L. Co. objected to any of them, then arbitration; that the

N. W. Co. should not carry the local traffic on the L. Co. lines, but should, if so required by the L. Co., carry local passengers for 15 per cent. of the local fares; that the companies should send by each other all traffic not otherwise consigned and to and from stations on the lines of each other whenever such lines formed the shortest route; that any differences under the agreement should be settled by arbitration under the Railway Companies Arbitration Act of 1859. The N. W. Co. advanced the £40,000, and the agreement as to running powers was acted upon for some time; and afterwards the L. Co. gave three months' notice to determine it, and it was held that the contract could not be terminated by the L. Co. This opinion was affirmed in 7 Law Rep. Eng. & I. App. Cas. 550.

It is thus seen that in the cases relied upon by the plaintiff the subject-matter of the contracts was definite, the agreements were based upon valuable considerations, and conveyed valuable rights in each instance, and each of these cases correctly held under the circumstances thereof that the contract could not be terminated at the will of either party.

In the case at bar, however, the identity of the subject-matter was left for future determination, and was only capable of being made certain by the concurrent act of the parties, and there is no present grant of any specific right therein capable of ascertainment, and neither party, for a failure to carry out the terms of the agreement, could require specific performance of the other, because of this uncertainty; neither can an action for damages for breach thereof be maintained, as will appear hereafter.

Another fatal defect in the contract is the uncertainty of its terms as applied to the subject-matter thereof, when construed in connection with the power reserved to the president of the railroad company to approve selections made by the town company. We cannot determine the number of acres which the town company was required to purchase or procure for any particular town site. It is a matter of common knowledge that some town sites would need a very small area, while others would need several hundred, and in some cases several thousand acres, and the contract provides no standard by which the acreage is to be determined, and certainly it was not intended that this important and indispensable element could be left to the arbitrary judgment or opinion of one of the two parties. We understand the law to be that a contract which is uncertain as to its subject-matter to such an extent that it is impossible to tell what the reciprocal obligations of the parties were, or where it does not prescribe some standard by which to measure the act to be performed or the result which it intends to secure, is void for uncertainty and cannot be enforced. Section 934, Rev. Laws 1910; *Cent. Mtg. Co. v. Mich. State Life Ins. Co.*, 43 Okla. 33, 143 Pac. 175; *Briggs v. Morris et al.*, 244 Pa. 139, 90 Atl. 532; *Parks v. Griffith Boyd Co.*, 123 Md. 233, 91 Atl. 581; *Ingram-Day Lbr. Co. v. Rodgers*, 105 Miss. 244, 62 So. 230, 48 L. R. A. 435; *Gould v. Gunn*, 161 Iowa, 155, 140 N. W. 380; *Howard v. East Tenn. V. & G. Co., supra; Cold Blast Trans. Co. v. K. C. Bolt & Nut Co.*, 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696; *Sloss-Sheffield Steel & I. Co. v. Payne*, 186 Ala. 341, 64 So. 617; *Price v. Atkinson*, 117 Mo. App. 52, 94 S. W. 816; *Lowe v. Ayer-Lord Tie Co.*, 97 S. W. 383, 29 Ky. Law Rep. 1302; *Oakland*

*Motor Car Co. v. Ind. Auto Co.*, 201 Fed. 499, 121 C. C. A. 319. It is no answer to this proposition to say that by their course of dealing over a long period of time the parties have made certain that which was uncertain, or that their acts and conduct, coupled with their subsequent negotiations, supplied the elements necessary to make it a valid contract in this respect, so as to confer upon one of the parties a right of action for an alleged breach thereof in respect to town sites not specifically agreed upon.

As to the town sites actually selected and sold, the contract is executed, and the parties are not complaining of any dereliction in this regard; no claim being made that proper accounting has not been had for every town site actually selected under the agreement. The parties evidently contemplated that each town site should constitute a separate transaction, as the contract stipulates that a separate account of each town site shall be kept, and when the original cost of land purchased in such town site shall have been received by the party of the first part, from the proceeds of sales of land or otherwise, the net proceeds of all subsequent sales are to be equally divided between the parties of the first and second part, and no lands are to be selected without the approval of the president of the railroad company. The contract being void for uncertainty, the agreement upon any particular site would give vitality to the contract to that extent only, and would not tend to give certainty to anything other than what was actually agreed to between the parties. *Cold Blast Trans. Co. v. K. C. Bolt & Nut Co., supra; Parks v. Griffith & Boyd Co.,* 123 Md. 233, 91 Atl. 581; *Lawrence et al. v. Robinson et al.,* 4 Colo. 567;

*Victoria Limestone Co. v. Hinton,* 156 Ky. 674, 161 S. W. 1109; 1 Story, Equity Jurisprudence, section 668.

Another reason why the contract cannot be upheld is that it formulates no basis from which the amount of damages for a breach thereof can be ascertained. Had the town company refused to comply with its part of the contract by securing sites, as it was obligated to do, it would have been impossible to compel specific perform-ance, because of this uncertainty as to the subject-matter and as to what the town company was under obligations to do; nor could the railroad company have recovered for a breach thereof, because it would have been impossible to determine the amount of such damages. *Gould v. Gunn,* 161 Iowa, 155, 140 N. W. 380; *Pulliam v. Schimpf,* 109 Ala. 179, 19 South. 428; *Ingram-Day Lbr. Co. v. Rodgers, supra; Lowe v. Ayer-Lord Tie Co.,* 97 S. W. 383, 29 Ky. Law Rep. 1302; *Central Mtg. Co. v. Mich. State Life Ins. Co.,* 43 Okla. 33, 143 Pac. 175. The case of *Cloe v. Rogers,* 31 Okla. 255, 121 Pac. 201, 38 L. R. A. (N. S.) 366, is not in conflict with this rule. That case announces the rule that profits, under certain circum-stances, may be considered the measure of damages for breach of a contract, when not too remote or conjectural to be susceptible of computation with reasonable cer-tainty. In that case the contract was for the real estate agent to plat and survey a certain 40 acres of land into a town site, and the price was agreed upon at which said lots were to be sold, and it was agreed that the difference between the appraised cost of the lots and the agreed selling price when lots were sold should be divided equally between the parties. The owner breached the contract after the agent had entered upon his duties and ex-pended time and money in carrying out his contract, and

the agent brought action for damages; and it was held that the loss of profits in that case was not so remote and conjectural as to be incapable of computation with reasonable certainty. Such is not the case here, however. No definite area was agreed upon as to any particular town site, nor was the selling price of the lots agreed upon, and there is no basis which we may take and from which we may determine any amount of damages whatever that would not be purely and wholly speculative and conjectural. And it does not help the situation to invoke the rule that all contracts are certain which are capable of being made certain, for certainty has been given to the subject-matter of this contract only so far as selections have actually been made and approved, and this cannot and does not give identity to the location or area of sites not agreed upon. The damages, if any, accruing to plaintiff from a breach of the contract, could only be the loss of prospective profits expected to be made from a sale of town sites, after deducting from the amount realized from these sources the value of the lots conveyed to the railroad company for depots, etc., the amount expended in acquiring such town sites, surveying and platting, and the cost of sale; all of which is indefinite, uncertain, and purely speculative, and, so far as the contract is concerned, without any basis of certainty whatever.

Being of the opinion that the contract is void for the reasons hereinbefore set out, it becomes unnecessary for us to consider and determine the question whether the contract creates the relation of partners between the parties thereto, and if so, whether such partnership would be *ultra vires* of the corporation and against public policy.

For the reasons herein given, the petition for rehearing is denied, and the judgment of the trial court in sustaining the demurrer to the petition is affirmed.

All the Justices concur.