The WESTERN STAR MILL COMPANY (GOOCH FEED MILL DIVISION), a Corporation, Plaintiff in Error,

v.

Ewing I. BURNS, d/b/a Burns Feed & Seed, Defendant in Error.

No. 37089.

Supreme Court of Oklahoma.

Dec. 11, 1956.

**566** ■ ■

Clark, Mize & Lillard, Salina, Kan., A. W. Trice, Jim F. Gassaway, Ada, for plaintiff in error.

Kerr, Lambert, Conn & Roberts, Ada, for defendant in error.

HALLEY, Justice.

On June 25, 1954, The Western Star Mill Company (Gooch Feed Mill Division), filed this action in the District Court of Pontotoc County against Ewing I. Burns, d/b/a Burns Feed & Seed. The plaintiff is a Kansas Corporation with headquarters at Salina, Kansas, and the place of business of the defendant is Ada, Pontotoc County, Oklahoma.

Plaintiff's action was based upon verified open account and alleged that there was a balance due thereon of $2,744.47 for feed products sold and delivered to defendant. Prior to the introduction of evidence the defendant admitted that he was indebted to the plaintiff in the amount sued for, but filed a cross-petition alleging that plaintiff was indebted to him in the sum of $2,-950 as damages for breach of an exclusive agency contract entered into in August, 1951, and complied with until January, 1954, or a period of about 29 months when it was terminated by the plaintiff to the defendant's damage as above stated.

We shall refer to the parties as they appeared in the trial court, that is, The Western Star Mill Company as plaintiff and Ewing I. Burns, defendant and cross-petitioner as defendant.

Defendant alleged in his cross-petition that in 1951, when the plaintiff entered into an oral agreement with him to the effect that he should have the exclusive sales agency to sell plaintiff's feed products in Pontotoc County, such feeds were not known and required a great deal of effort and the expenditure of considerable money on his part to introduce and sell such products in that area and that he performed such agreement according to its terms.

Defendant further alleged that he entered into his agreement with plaintiff in full reliance on his part that he would have an exclusive agency so long as he promoted or pushed the sale of plaintiff's feed and paid his bills. He also alleged that plaintiff knew at the time it made such agreement with him that after he had introduced its products in that area that it could transfer the agency to some other person to its advantage, thus making the actions of the plaintiff fraudulent.

The case was tried to a jury and resulted in a verdict for defendant on his cross-petition in the sum of $2,367, which amount was to offset that amount of the agreed judgment for the plaintiff.

There are some important facts that are not in dispute. No part of the agreement between the parties was reduced to writing. There was no verbal mention of how long the contract would remain in effect. The defendant was not required to handle plaintiff's feeds only, but continued to handle Purina Feeds. The defendant was free to buy whatever amount he wanted and to sell at any price he chose. He was to have Pontotoc County as his territory.

However, defendant contended that there was an existing custom and usage among milling and feed concerns to the effect that such exclusive contracts should be effective until dissolved by mutual consent or breached by the parties or one of them, and only then after due notice and attempt to reduce loss. Mr. Burns at first said that such a contract could only be terminated after 30 days notice, but later stated that they could not be ended on 30 days notice. Plaintiff's witnesses testified that they had never heard of such a custom or usage among the flour millers or feed manufacturers. No witness except the plaintiff testified in regard to such usage or custom.

Soon after the contract was terminated by plaintiff in January, 1954, we find a letter dated February 6, 1954, from the plaintiff to the defendant in which the former states positively that if defendant has contracted Gooch Feeds to any of his feeders, plaintiff will sell him feed for delivery to such customers, and will furnish defendant feed to complete a feeding experiment on 20 head of his own cattle and will take back and allow defendant credit for any feed on hand that he cannot sell. Apparently the defendant failed to accept this offer for he alleges that he had to go to another county to secure Gooch Feeds to meet his commitments. This is one of the elements of damages claimed by defendant for the termination of contract by plaintiff on or about January 29, 1954.

The plaintiff has appealed and presents five propositions which will be considered in numerical order. It is first submitted that the contract between the parties is lacking in mutuality of obligation and could be terminated by either party without liability.

The defendant himself testified that when he entered into the agreement to sell Gooch Feed in Pontotoc County he talked to Mr. Vanier, President of the plaintiff company over the telephone and defendant was then asked:

"Q. In that conversation there with Mr. Vanier over the telephone, was there any agreement concerning the length of time that you would have an exclusive franchise for the sale of Gooch Feeds? A. No, sir.

"Q. Was it mentioned by either of you? A. No, sir, I believe not.

\*     \*     \*     \*     \*     \*

"Q. Was there ever any written contract between you and Western Star Mills, or, the Gooch people? A. No, sir."

Mr. Burns testified that he fixed his own selling prices; that there was nothing in the agreement as to the amount of feed that he was required to take and that he was not told that he had to handle all of the Gooch lines of feed or any particular part of it.

The witness testified that he was not free to quit handling Gooch Feeds without "formal notice and a meeting of the minds agreement." He then testified that he could quit the business as long as he could pay the bills. He was asked if either party became dissatisfied, whether the contract could then be ended and said:

"You could end the contract with due notice and consideration.

"Q. How much notice? A. At least thirty days."

When asked if the Gooch people could have ended the contract upon 30 days notice to him he answered, "No." On cross-examination he was asked again whether he

could have quit handling Gooch Feed and he answered that he did not know.

The testimony of defendant shows that he was not obligated to buy any particular feed or any certain amount of feed and that he could fix his own selling prices and there was positively no agreement as to the time the contract was to run, and we do not think that plaintiff would have had any cause of action had Mr. Burns decided not to handle its feed at any time.

■■■ In Barnsdall Refining Co. v. Desmond, 173 Okl. 177, 46 P.2d 913, it is said in the first paragraph of the syllabus:

"A purported contract by the terms of which D is to sell the gasoline and oil of B without there being any agreement as to any definite amount of such products to be sold and without any definite time being fixed for the duration of the contract is so wanting in mutuality as to be of no effect, and no cause of action arises from a breach thereof."

In the early case of Arkansas Valley Town & Land Co. v. Atchison, T. & S. F. Ry. Co., 49 Okl. 282, 151 P. 1028, 1034, it is said:

"* * * We understand the law to be that a contract which is uncertain as to its subject-matter to such an extent that it is impossible to tell what the reciprocal obligations of the parties were, or where it does not prescribe some standard by which to measure the act to be performed or the result which it intends to secure, is void for uncertainty and cannot be enforced. * * *" (numerous cases cited)

In E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, 227, 89 A.L.R. 238, the court had under consideration a contract whereby the Reno Company claimed it was to be the sole distributor in Iowa of a certain car polish so long as the Du Pont Company was satisfied with its services. The Du Pont Company claimed that if the Reno Company could terminate the contract at will it was also terminable by the Du Pont Company. It was said in part:

"There is much to be said in favor of requiring men to adhere strictly to their undertakings, whatever they may be, but there are certain established rules with reference to contracts which are not to be disregarded, no matter how great the hardship may be which grows out of an adherence to them. No doubt, the rule which requires mutuality of obligation with respect to contracts to be performed in the future, where the promise of one party constitutes the sole consideration for the promise of the other, arises from what is regarded by the courts as the inherent unfairness of enforcing a contract which requires performance by one of the parties, but leaves the other party free to accept or reject performance."

The court concluded by saying:

"We have much sympathy with the theory upon which the case was disposed of in the court below. It seems fair that, after having spent six years in developing the territory assigned to it, the Reno Company should have been permitted to continue or should have been compensated for the injury done it by having its business taken away. However, the injury done to the Reno Company was one against which its contract, rather obviously, did not afford protection. As was said by Judge Stone in the Woerheide case [Woerheide v. Barber Asphalt Paving Co., 8 Cir.] (page 204 of 251 F.) : 'The entire trouble is found in the contract itself. It was not at its making strong enough to hold. * * *'"

It is not disputed that no time for termination of the contract was agreed upon by the parties. It was not even mentioned in the agreement. Plaintiff claims that in the absence of a termination date agreed upon, or in case of a custom and usage

which was known by both parties, such a contract is so indefinite as to the time it will continue that it may be terminated by either party at any time. Plaintiff cites Arkansas Valley Town & Land Co. v. Atchison, T. & S. F. Ry. Co., supra, wherein it is said:

"* * * The contract, however, does not by its terms fix any period of duration between the parties, and its duration is indefinite, so that we are unable to determine just how long the parties contemplated that it should continue. This being true, it might be terminated by either party at any time. * * *" (numerous cases cited)

Plaintiff also relies upon Dunn v. Birmingham Stove & Range Co., 170 Okl. 452, 44 P.2d 88, 89, where the facts were similar to the facts in the case before us. A dealer in Tulsa agreed with the stove company by which the dealer agreed to give a substantial volume of business to the stove company and was given an exclusive agency to sell the stove in that area. No term of duration was fixed. The court said:

"* * * The general rule as to contracts of the nature here involved is that, where the contract itself provides no definite period of time it shall remain in force, the law presumes it shall last as long as both parties desire, and terminate at the will of either party. 2 C.J. 525; Staroske v. Pulitzer Pub. Co., 235 Mo. 67, 138 S.W. 36; Willcox & Gibbs Sewing-Mach. Co. v. Ewing, 141 U.S. 627, 12 S.Ct. 94, 35 L.Ed. 882."

The early case of Rogers v. White Sewing Machine Co., 59 Okl. 40, 157 P. 1044, 1045, is cited and the court there said relative to a contract to sell sewing machines in a given territory as follows:

"* * * In the instant case the testimony does not disclose that the defendant obligated himself to sell the plaintiff's machines alone, or that he was to devote any particular part of his time and attention to the sale of such machines. We think the most

serious difficulty with this contract lies in the indefiniteness as to its duration. The defendant could have terminated it at any time without incurring any liability to the plaintiff; and we think that the facts in the instant case fall within the rule laid down by this court in the case of Arkansas Valley Town & Land Co. v. Atchison, T. & S. F. Ry. Co., [49 Okl. 282] 151 P. 1028."

Was the evidence sufficient to establish that the custom or usage in the milling and feed business as to the duration of exclusive dealer contracts so well established and notorious as to justify the court in taking judicial notice of custom and usage? Only the defendant testified that the custom existed. Under the evidence the plaintiff was unaware of any such custom or usage. No distinterested witness was called to support this claim of the defendant although it was shown that there were more than twenty feed dealers in Pontotoc County.

Plaintiff relies upon Clemson v. Century Petroleum Co., 179 Okl. 193, 64 P.2d 1219, 1221, wherein it is said:

"Unless a custom or usage is of such a general nature as to be susceptible of judicial notice, it must be established by evidence, and the burden of proving the same rests on the person asserting and relying upon the same. * * *"

In Cherokee Grain Co. v. Elk City Flour Mills Co., 78 Okl. 120, 188 P. 1067, 1068, the plaintiff was compelled to go into the open market and buy wheat at a higher price than defendant had agreed to sell and deliver for, but refused to do so. In considering the question of custom and usage the court quoted with approval from Robinson v. United States, 13 Wall. 363, 80 U.S. 363, 20 L.Ed. 653, as stated in the syllabus as follows:

"'Custom or usage may properly be received to ascertain and explain the meaning and intention of the parties to a contract, whether written or parol, the meaning of which could not be ascertained without the aid of

such extrinsic evidence, where the parties knew of the existence of the custom or usage, and contracted in reference to it.' "

In New York Life Ins. Co. v. Federal National Bank of Shawnee, Oklahoma, 10 Cir., 143 F.2d 69, 73, the court said:

" * * * In order for a custom or usage to be available against a person, it must be so notorious as to affect him with knowledge of it, and raise the presumption that he dealt with reference to it, or he must be shown to have had actual knowledge of it. * * *

* * * * * *

"Here, there was no proof that the insured had actual knowledge of any custom with respect to determining the attained age of an insured, or of facts from which it could be presumed that he had knowledge of any such custom and that he contracted with reference thereto. The proof falls far short of establishing a notorious, universal, and well-established custom."

There is no evidence that the plaintiff here knew of any such custom and the burden of proving such custom and usage rested upon the defendant. If such existed he failed to prove that the plaintiff knew of it or that it was so notorious that the court should have taken judicial notice of its existence.

Plaintiff submits that if the contract in question was not terminable at the will of either party it is invalid by the statute of frauds, wherein it is provided that an agreement that by its terms, is not to be performed within a year from the date it is made, is void unless such agreement or some note or memorandum thereof be in writing and subscribed by the parties to be charged.

Mr. Burns testified that in the feed industry where an exclusive franchise for certain territory is granted and no time limit is fixed it continues in effect as long as "the dealer sells and pushes the feed and pays his bills."

The defendant relies upon Roxana Petroleum Co. of Oklahoma v. Rice, 109 Okl. 161, 235 P. 502, to sustain its view that the contract before us is not rendered invalid by the statute of frauds. In the Roxana case, attorneys had the exclusive right to represent Roxana in Oklahoma and Texas so long as it did business in these states. They were required to give up all other clients. The attorneys were discharged and they sued for damages for breach of contract. The contract was verbal and the statute of frauds was urged to show the contract void. The court held that the contract was not rendered invalid by such statute because by its terms it might have been terminated within a year from its date, had Roxana ceased to do business in Oklahoma and Texas within one year.

The facts in the Roxana case are materially different from those before us. In Dicks v. Clarence L. Boyd Co., 205 Okl. 383, 238 P.2d 315, 318, 28 A.L.R.2d 870, the Roxana case is discussed in the following language:

"Plaintiff calls attention to our holding in Roxana Petroleum Company of Oklahoma v. Rice, 109 Okl. 161, 235 P. 502, in support of his contention that the oral contract is not within the statute of frauds because it is capable of performance during the life of plaintiff within the year. In the Roxana case the employment was to continue as long as the company did business in Oklahoma and Texas and this court held it was a contingency which might become effective in less than a year. If this court had intended to adopt the rule urged by plaintiff, it would be necessary to dispose of the case by saying that the plaintiff might have died within a year and therefore the contract is not within the statute of frauds."

In the Dicks case, supra, the court held that where a contract was to

continue "so long as plaintiff was able to continue actively in said work", it was invalid under the statute of frauds, Section 136, 15 O.S.1951, because not in writing. The contract here in controversy had existed for more than two years when plaintiff terminated it. We conclude that under the rulings above cited that the oral contract between the parties here is invalid as violative of the statute of frauds and therefore, unenforceable even if valid in other respects.

Is the evidence sufficient to support a finding of damages in favor of defendant Burns? He is still in the feed business at Ada. He proved his total sales during the twenty-nine months that he handled Gooch Feeds, his average net profit and monthly profit from such sales, but he failed entirely to show that he suffered a loss because the Gooch agency was denied him in January, 1954. He failed to show that his sales of feed or net profit had declined. He had at all times handled Purina Feeds and so far as the record shows his net profit may have increased after the termination of the Gooch Feed contract. Anticipated profits are too speculative to justify damages unless it be shown that the business was destroyed or a loss of profits had occurred by reason of the termination of the contract. Keener Oil & Gas Co. v. Stewart, 172 Okl. 143, 45 P.2d 121.

The burden was upon the defendant to prove with reasonable certainty the amount of profits lost to justify any recovery of damages for loss of profits resulting from an alleged failure of the plaintiff to continue to furnish goods for sale by Mr. Burns. We think the evidence falls far short of that required to sustain recovery of any sum for loss of profits. No definite loss of profits was attempted to be shown. Defendant's business was not destroyed or even interrupted. Plaintiff offered to furnish Gooch products to enable defendant to fill existing orders and to enable him to complete a personal feeding experiment. His failure to accept this offer precluded recovery for any loss or inconvenience suf-

fered by defendant from the termination of the contract by plaintiff.

The defendant Burns was asked about the custom of the feed industry relative to exclusive sales contracts for the sale of feeds and answered:

"A. The relationship between the feed mill and dealer is on a basis of continued business relations together and so long as the dealer pays his bills and shows due diligence to the selling of the feed and paying for it. The feed dealer feels bound to the manufacturer for as long as they continue with a good quality feed at competitive prices.

"Q. And that is the custom in the industry? A. Yes, sir."

We find that in the absence of any evidence that plaintiff knew of such custom, as is contended for by the defendant, and the fact that such custom or usage was never mentioned by the parties in this agreement, we are forced to the conclusion that the plaintiff is not bound by any such custom or usage. Especially is this so when it was not shown to have been so well established that the court would be justified in taking judicial notice thereof.

The defendant pleaded that the contract was fraudulently entered into by the plaintiff. We have examined all of the evidence and are unable to find any substantial evidence to support this contention. There is not one word of testimony to prove that the plaintiff intended to defraud the defendant and in the absence of such testimony we find no reason why this question should have been presented to the jury.

We find the contract in question lacking in mutuality, invalid under our statute of frauds in that as contended by the defendant it was not to be performed within one year from the date it was made, and that the claim of the defendant for damages is not supported by any competent evidence as to damages suffered by the defendant from plaintiff's termination of the contract. The judgment for defendant on his cross-petition is reversed with instructions to en-

ter judgment for the plaintiff on defendant's cross-petition. The stipulated judgment for plaintiff is affirmed.

JOHNSON, C. J., WILLIAMS, V. C. J., and CORN, JACKSON and CARLILE, JJ., concur.

BLACKBIRD, J., dissents.